UTICA,
Aug. 1828.

Rogers
v.
Jones.

Rogers *vs.* Jones, Supervisor of the town of
Oyster-Bay.

Error from the common pleas of the county of Queens. Jones, as supervisor of the town of Oyster-Bay, sued Rogers before a justice of the peace, for the recovery of a penalty of $12,50, created by a by-law of the town of Oyster-Bay, passed in town-meeting, on the 5th April, 1825, declaring "that no person, not being an inhabitant of Oyster-Bay, shall be allowed to rake or take any oysters in the creeks or harbors of the town of Oyster-Bay, under the penalty of $12,50 for each offence," and giving the forfeiture to certain persons appointed to superintend the oystering. The plaintiff declared against the defendant, that on the 8th April, 1825, he entered the harbor of Oyster-Bay, near Lloyd's Neck beach, in the town of Oyster-Bay, and caught and carried away a quantity of oysters, contrary to the town law of April 5th, 1825, by which he became indebted to the plaintiff as supervisor of the town, in the sum of $12,50. The defendant demurred to the declaration, and the plaintiff joined in demurrer ; and after argument, in which the defendant insisted upon his right to take oysters in the place aforesaid, any law, ordinance or regulation of the town of Oyster-Bay, to the

*Where a patent or grant conveys a tract of land by metes and bounds, the land under water as well as other land will pass, if the land under water lies within the bounds of the grant. By the common law, every arm of the sea or navigable river, so high as the sea flows and re-flows, belongs to the king; but by grant or prescription, a subject may have the interest in the water and soil of navigable rivers, and the king may grant fishing within a creek of the sea, or within some known*

precinct. There is no prohibition in the 16th chapter of *magna charta* to the right of the king to grant a fishery in navigable waters to an individual or body corporate. The object of that statute was to prevent the king from putting any rivers *in defenso* for his own recreation, except such as had been put in defence in the time of Henry II ; and though restricted as to the *occupancy* of rivers for his pleasure, was at liberty to *grant* the land under the rivers and navigable waters in his realm at his will and pleasure. *Prima facie*, it is a matter of common right to fish in an arm of the sea, and may be exercised until an individual proves that *he has the right*, which may be done by shewing a grant or prescription. The case of *Warren* v. *Matthews*, reported in 1 *Salk.* 357, and in 6 *Mod.* 73, is probably misreported. The patent to the inhabitants of Oyster-Bay, conveyed all the lands under water within the bounds of that grant, together with the exclusive right of fishing in the waters within the same. Such right is part of the common property of the town, and may be regulated by rules and regulations adopted in town meeting. It must, however, be so used as not to occasion an annoyance to the passage of ships or boats, and is subject to the laws of the state for the conservation of fish or fry. A by-law may be good in part and void for the rest. It would seem that a by-law of a town or corporation imposing penalties for particular offences is not void, solely on the ground that penalties for the same offences are created by a general law of the state.

contrary notwithstanding, the justice gave judgment for the plaintiff. The defendant appealed to the common pleas of Queens, where the plaintiff again recovered, and judgment was rendered in his favor; *to reverse which judgment a writ of error was brought to this court.*

Notwithstanding, that by the pleadings before the justice, an issue of law only was joined, on the argument of the cause in the common pleas, the following facts were shewn and admitted: On the 29th September, 1677, a patent was granted by Sir Edmond Andross, then governor of New-York, under the duke of York, to Henry Townsend, senior, and six other persons, as patentees for and on the behalf of themselves and their associates, the freeholders and inhabitants of the town of Oyster-Bay, of the tract of land comprising the township of Oyster-Bay, describing it particularly and concluding as follows: "bounded on the north by the sound, on the east by Huntington limits, on the south partly by the sea and partly by Hempstead limits, and on the west by the bounds of Hempstead aforesaid, including all the necks of land and islands within the aforesaid described bounds and limits." *By the patent was granted the above tract,* "with the islands and necks of land as aforesaid, together with all the woodland, plains, meadows, pastures, quarries, marshes, waters, lakes, rivers, fishing, hawking, hunting and fowling, and all other profits and emoluments to the tract belonging, and all privileges and immunities belonging to a township within the then government." On the 5th April, 1825, the by-law, under which the suit before the justice was commenced, was passed in town-meeting of the freeholders and inhabitants of the town of Oyster-Bay, together with other regulations in the words following, viz. "1. Voted that no person, not being an inhabitant of Oyster-Bay, shall be allowed to rake, or assist in taking or raking, or employ another to take or rake any oysters in the creeks or harbors of the town of Oyster-Bay, under the penalty of twelve dollars and fifty cents for each offence, the whole of the forfeiture for the use of the persons appointed to superintend the oystering. 2. Voted, that no person be allowed to take or rake oysters in the creeks or harbors of Oyster-Bay, but from the 15th day of

November to the first of March, both days included, under the penalty above mentioned. 3. Robert Colwell, Jacob Colwell, John Townsend and John Martin, were chosen to superintend the oystering, and receive for their use the whole of the fines."

On the 8th April, 1825, Rogers, the defendant below, being a citizen of the state of New-York, did fish and oyster in the waters of the bay or harbor of Oyster-Bay, and took and carried away 100 oysters. The place where the oysters were taken, was adjacent to and within one mile of Long Island sound, opposite the village or town of Oyster-Bay, nearer Lloyd's Neck than any other land, within about one hundred yards of the beach on the said neck, and where the water in the bay is at least twenty feet deep at low water. On the 11th April, 1825, the suit was commenced before the justice by Jones, who was, at the time, the supervisor of the town. There was a written stipulation of the parties attached to the record, that the cause should be decided by this court *on the merits.* The case was submitted to the court on written arguments, of which the following sketch is presented.

*D. Rogers,* plaintiff in error, in *pro. per.* By the common law of *England,* the right of fishing in navigable rivers or arms of the sea is common to every subject, unless restrained by grant or prescription investing some person or body politic with *an exclusive right;* and no such right can be claimed, unless supported by a grant or prescription extending back as far as the reign of Henry II. The prerogative of granting free and several fisheries was first claimed by the crown, upon the establishment of the *Normans,* and was deemed a usurpation by the people. (2 *Black. Comm.* 39. 3 *Cruise's Dig.* 297.) The exercise of it was subsequently restrained by *magna charta.*

The doctrine on that subject is thus laid down in *Bacon's Abridgment, tit. Prerogative D.* 156: "But notwithstanding the king's prerogative in seas and navigable rivers, yet it has always been held that a subject may fish in the sea, which being a matter of common right and the means of livelihood,

cannot be restrained by grant or prescription." Again ; " Every subject of common right may fish in a navigable river as well as in the sea, and the king's grant cannot bar them thereof. The crown only has a right to *royal fish,* and that the king only may grant." Bacon cites 1 *Salk.* 357 ; 2 *Salk.* 637 ; *Bro. Custom,* 46 ; 6 *Mod.* 73. The case in 1 *Salk.* was where one claimed *solam piscariam* in the river *Ex,* by a grant from the crown ; *et per Holt, C. J.* "the subject has a right to fish in navigable rivers as he has a right to fish in the sea, and a *quo warranto* ought to be brought to try the title of this grantee, and the validity of his grant." (See also 1 *Mod.* 105 ; 2 *H. Black.* 182 ; *Willis,* 265 ; 2 *Bos. & Pul.* 472.)

*Vattel,* in his *Law of Nations,* (b. 1, ch. 20, p. 168,) says, "There are some things which in their own nature cannot be possessed ; there are others, the property of which no one can attribute to himself, and that remain common when a nation takes possession of a country." The Roman civilians called these *res communes* things common : such as the air, running water, the sea, the fish and the wild beasts. And again ; " It is manifest that the use of the open sea, which consists in navigation and fishing, is innocent and inexhaustible : he who navigates or fishes in it does no injury to any one." (*Ib. ch.* 23, *p.* 185. *See Cooper's Justinian, lib.* 2, *sect.* 1, 67, 8.)

The patent of 1677, under which the plaintiff below claimed, conferred no *exclusive right of fishery* upon the freeholders and inhabitants of Oyster-Bay. Previous to the year 1650, the English colony, which was planted at Plymouth in 1620, had extended their settlements to the west on the main, and on Long Island as far as the west bounds of Oyster-Bay ; and in that year all the territory east of the west bounds of Oyster-Bay was ceded by the Dutch, who were then in possession of New-York, to the English. In 1664, the colony was surrendered to the English : it was re-conquered in 1673, and yielded up by treaty in 1674. In June, 1674, the then duke of York, afterwards James II, obtained a confirmation from his brother, King Charles II, of a patent of New-York and New-Jersey, which had been granted to him in 1664,

UTICA,
Aug. 1828.

Rogers
v.
Jones.

and two days afterwards commissioned Sir Edmond Andross to be governor of his territories in America. (*Smith's Hist. of N. Y.* 17 *to* 28 *and* 61. *Historical Collections,* 189 *to* 234.) The town of Oyster-Bay was settled in 1653. (*Wood's Hist. of Long Island,* 12.) In 1665, there had been promulgated a code of laws for the government of the province of New-York, called "the Duke's laws," (*Hist. Coll.* 307,) in which the privileges of *towns* were declared and their powers defined, which was the origin of the present act relative to the duties and privileges of towns. Under these circumstances, the patent of 1677 issued, which, after reciting that " whereas there is a certain town upon Long Island, commonly called and known by the name of Oyster-Bay," and describing it by metes and bounds, ratifies, *confirms* and grants the tract mentioned in it to the patentees, and confers all the privileges and immunities belonging to a township within the government of the province. The principal, if not the only object of the patent, appears to have been to settle and define the boundaries of the township which before existed. *An exclusive right of fishery is not given.* Among the appurtenances, *fishing* is enumerated with hawking, hunting and fowling ; but it is contended that an *exclusive right* of fishing, such as is claimed in this case, would not pass by this single word. If it had been intended to be granted, it should have been by express words, and not left to implication. The right of soil beneath the waters in navigable streams, must be by grant of the land covered with water. (2 *Bl. Com.* 19.) In the enumeration of the powers and privileges of towns in the duke's laws, no power is given to one town to exclude the inhabitants of another town from fishing within its bounds. It could not have been intended to convey to the inhabitants of Oyster-Bay *an exclusive right of fishery,* and it could not so operate, inasmuch as the king of England, when the patent was granted, being restrained in his prerogative by *magna charta,* had not the power to grant such right. Charles II, in his grant to the duke of York, did not confer such power, nor did the duke in his commission to his governor, authorize such grant. Sir Edmund Andross, therefore, could not legally grant such exclusive right ; on the contrary, he

UTICA,
Aug. 1828.

Rogers
v.
Jones.

was expressly prohibited from issuing any patents repugnant to the laws of England.

The patent of 1667, as conferring an exclusive right of fishery, cannot be supported, in conformity to the opinion of Lord *Mansfield*, in *Campbell* v. *Hall*, (*Cowper*, 204,) on the ground that it was a legislative act, inasmuch as the colonial assembly was not established until 1683. Such a power is based on the assumption that this was a conquered country, which the facts will not warrant. The claim to the territory rested in right of discovery, not conquest. It was ceded to the English under their claim in 1650. But did the king possess legislative power, he had not the right, according to the common law established by *magna charta*, to grant an exclusive right of fishery ; and if he did do so, and did create Oyster-Bay an *imperium in imperio*, it ceased to be so on the division of the state into towns and counties.

The right to pass the by-law in question is not conferred by statute. The law relative to the duties and privileges of towns, (2 *R. L.* 131,) gives no such power. The inhabitants of the several towns in the state, in town-meeting assembled, may make prudential rules and regulations relative to the use and management of their common lands, meadows and *other commons*. These latter words cannot be understood to mean *fisheries*. The word *commons* must be understood according to its usual meaning and legal acceptation. In common parlance, it means "an open ground equally used by many persons." (*Walker's Dictionary*, 291.) In legal acceptation, it is an incorporeal hereditament, distinguished from a franchise. Commons are chiefly of four sorts : common of pasture, of piscary, of turbary and estovers. Common of piscary is a liberty of fishing in another man's water. (2 *Black. Comm.* 21, 32, 34.) It differs from a free fishery in that the latter is *an exclusive right*. The former is not so. (2 *Black. Comm.* 39.) If, in a case like the present, this power is granted by statute, rules and regulations may be adopted by one town as to the use of a fishery in another town. Besides, the by-law does not *regulate* the fishery : it *prohibits* it to all but the inhabitants of the town ; and it is not *pru-*

*sential,* as it gives the forfeiture to individuals instead of applying it to the use of the town as directed by the statute.

The doctrine advanced in the treatise of Sir Matthew Hale, in Hargrave's Law Tracts, *de jure maris,* &c. does not support the claim of the town of Oyster-Bay. There are various passages in this work, which, on a cursory examination, might be supposed to favor the claim set up ; but by comparing them with other passages, and applying the great fundamental principles of the British constitution, it will be found that the learned sage can only be rendered consistent with himself, by applying the observations he makes to cases of grants previous to *magna charta ;* and that this is so, is evident from the fact, that every precedent stated by him in support of a prescription to an exclusive right of fishery, is anterior to the reign of Henry II.

The several towns in the state have a right to make prudential rules and regulations relative to the use of lands, the right of soil in which is vested in them, and in no other lands. (6 *Johns. R.* 133.) If, as is contended, the right of soil in the land under water is vested in the town of Oyster-Bay by the patent, the monstrous absurdity would follow, that they have a right to demand tolls for *anchorage* of vessels, &c. &c.

By the revolution, the dominion of the king of England over the sea and navigable rivers within our territories, and his prerogative relative to fisheries as restrained and limited by *magna charta,* vested in the people of this state, who lodged the same in the legislature as their depository for their use. This prerogative has accordingly been exercised over the soil and fisheries in our navigable rivers. The legislature have authorized the commissioners of the land office to make grants of land under water. (1 *R. L.* 293.) They have prohibited persons, not citizens, from taking shell-fish and other fish in our waters. (*Statutes,* 4th vol. b. 248.) They have, in a variety of instances, regulated the fisheries within this state, not only in navigable rivers, but in creeks and ponds. All these acts are legislative expositions, that the right over the soil and fisheries of our navigable rivers are vested in the people in their collective sovereign capacity, and not in the inhabitants of the several towns bordering

upon bays and rivers. Other towns have charters as broad, and granting as ample powers as the charter of Oyster-Bay; and if Oyster-Bay has an exclusive right of fishery within its bounds, other towns have equal rights, and every instance of legislation on the subject has been an act of usurpation. By the law above referred to, prohibiting persons, not citizens, from taking shell fish within the state, penalties are imposed. What would be the effect, should a person subject himself to a penalty under that law, and also to a penalty under the by-law of Oyster-Bay for one and the same offence ? Could a recovery under *the town* law be plead in bar to a prosecution under the state law, or must there be two recoveries for the same offence ?

Although in this state the point here arising has not been directly adjudged, yet the principles established and recognized in several cases, appear decisive of the question now before the court. In a sister state, however, the question has been distinctly settled, after a full discussion by counsel, and a patient and careful examination by the court of all the cases in the books. In *Palmer* v. *Hicks*, (6 *Johns. R.* 133,) it was decided, that to entitle a town to enact rules and regulations relative to the use of lands, it must be shewn that the town has a right of property in the lands, the use of which is regulated ; and that the extension of the bounds of a town over a bay or into a sound, is merely for the purpose of jurisdiction, and is no evidence of a grant of property in the soil covered by the water ; the court adding, all the ground under the navigable waters of the Hudson river, is within the boundaries of some town, for the purpose of civil and criminal jurisdiction ; but it does not follow that the lands under the water belong to the towns. And in *Hooker* v. *Cummings*, (20 *Johns. R.* 90,) the court say, that rivers are to be considered navigable as far as the sea ebbs and flows, and so far the right of fishing, as well as of navigation, is *common* to all. (See also 13 *Johns. R.* 497, and 17 *Johns. R.* 195.) In *Carson* v. *Blazer*, (2 *Binney's R.* 475,) it was held in *Pennsylvania*, that the Susquehanna was a navigable river, and therefore no one had an exclusive right of fishing therein. In *Arnold* v. *Monday*, (1 *Halstead's R.* 1 *to* 94,)

decided in *New-Jereey*, the question is completely put at rest, that "*navigable rivers, where the tide ebbs and flows*, the ports, bays, coasts of the sea, including both the waters and the lands under the waters, for the purposes of passing and repassing, navigation, fishing, fowling, sustenance and all other uses of the waters and its products, *are common to all the people of New-Jersey.*" The title to the territory comprising New-York and New-Jersey, is derived from the same source, to wit, the grant from Charles II. to the duke of York, in 1664. The question, therefore, was the same there as it is here ; and although this court is not asked to go the full length of adopting the various principles recognized and approved by the court in New-Jersey, it is asked that they will decide that a *town* has no right, without legislative authority, to claim *an exclusive right* over the fishery in any of the navigable waters of the state, and enforce such claim by prohibitory ordinances, and the infliction of penalties imposed to carry such ordinances into effect.

*D. S. Jones,* for defendant in error. The inhabitants of the several towns in this state, in town-meeting assembled, being by statute authorized to make rules and regulations to protect their common lands from trespass, and to direct the times and manner of using their common lands and meadows, and other commons; and the harbor of Oyster Bay, or the lands lying under the water where the oysters were taken by the plaintiff in error, being part of the common lands or other commons of the town, the by-law in question was lawfully made to protect and to regulate the use of the common property of the town.

The patent of 1677, grants a certain tract of land bounded on the north by the sound, and including of course the harbor of Oyster Bay, "together with all the woodland, plains, meadows, pastures, quarries, marshes, *waters*, lakes, rivers, *fishing*, hawking, hunting and fowling, and all other profits, &c. ;" and all the lands and premises contained within the bounds of the town, have become private property, except the great plains in the middle of the island, the marshes, creeks and bays on the south side of it, and the

harbors on the north side : These now remain, and have been, ever since the date of the patent, *the common lands and meadows, and other commons of the town.*

By the 5th section of the act to amend the act relative to the duties and privileges of towns, (*Statutes, vol.* 6, *b.* 207, *passed April* 17, 1823,) the inhabitants of the several towns in the state, in town meeting assembled, are authorized to make such prudential rules and regulations as they may judge necessary and convenient for preserving and protecting their common lands from trespass, and for directing the use and management, and the times and manner of using their *common lands and meadows and the other commons.* The by-law in question was passed subsequent to the enactment of this act.

The plaintiff in error contends that the town of Oyster-Bay had no right of property in the lands where the oysters were taken, because, as he alleges, the propriety and right of soil beneath the water in the harbor never passed by *the terms of the patent,* and consequently the town had no right to pass the by-law under which he was prosecuted ; and in support of his allegation, urges that whenever the right of soil beneath the waters in a navigable stream is intended to be granted, the grant *must be of* "land covered with water," and cites 2 *Black. Comm.* 19, to bear out this position. The authority cited does not support him. As to what passed by *the terms of the patent,* the boundaries of the premises granted, are distinctly defined ; they embrace the whole harbor of Oyster-Bay ; and the lands, hereditaments and premises, waters, fishing, &c. within these boundaries, are granted to the patentees for themselves and their associates, heirs, successors and assigns. The language of the grant is as full and explicit as could have been employed to grant all the lands and premises within the boundaries described.

Charles II. had the right to grant to the duke of York, in full and absolute property, all the lands under the navigable waters within the limits of the grant, and the right to a several fishery in those waters. That the king is the owner of the land under all the navigable waters of his dominion, is admitted by the plaintiff in error ; but it is contended that he cannot

convey such lands to a private person for a private use, and that the grant was void as contrary to the law of nature. Now, though *Vattel* says that the air, running water, the sea, &c. are common property, and as to the latter, particularly, that it is manifest that the use of the open sea, which consists in navigation and fishing, is innocent and inexhaustible, and nature does not give to man a right of appropriating to himself things that may be innocently used, and that are inexhaustible and sufficient for all; yet, he says, the various uses of the sea near its coast *render it very susceptible of property.* (*Vattel*, book 1, ch. 23, sect. 280, 281, 287. *See also Grotius*, book 2, ch. 2, sect. 3, and *Azuni's Maritime Law*, part 1, ch. 2, art. 1, sect. 3.) The *civil law* has also been relied on by the plaintiff in error, but the civil law never was in force in England.

The common law of England or *magna charta*, did *not* prohibit Charles II. from granting to the duke of York a several fishery in the waters of Oyster-Bay harbor, or from granting to him the absolute property in the lands under those waters. By the common law, since the conquest, to the present day, the king is the absolute owner of all the lands within his dominions, and it is a principle of the English tenures, that the king is the universal lord and proprietor of all the lands in his kingdom, and that no man doth or can possess any part of it, but what has mediately or immediately been derived as a gift from him to be held upon feudal services. (2 *Black. Comm.* 52. 6 *Com. Dig. D.* 63. 1 *Black. Comm.* 264.) The king has the property *tam aqua quam soli*, and all profits of the sea and all navigable rivers. (5 *Com. Dig. Navigation, A.* 3.) So the property of the soil in all rivers which have the flux and reflux of the sea, belongs to the king, and not to the lord of the manor adjoining, without grant or prescription; (5 *Com. Dig. Navigation, A.* 7;) and every arm of the sea or navigable river, so high as the sea flows, and reflows, belongs to the king; but by grant or prescription, a subject may have the interest in the water and soil of navigable rivers. (5 *Com. Dig. Navigation, B.*) The king may grant fishing within a creek of the sea, or in some known precinct, that hath known bounds

though within the main sea, he may also grant the very interest itself, viz, a navigable river that is an arm of the sea, the water and soil thereof. (*Sir Matthew Hale's Treatise, de jure maris, in Hargrave's Law Tracts, ch. 5, page* 17. *See also pages* 10 *and* 12 *of same work.*)

The *sixteenth* chapter of *magna charta*, (9 *Henry III.*) is the foundation of the doctrine urged on the other side, that the kings of England were prohibited from making grants of rivers and rights of fisheries in rivers or arms of the sea. It is not pretended that the king had not such power previous to the granting of *magna charta*. The 16th chapter of *magna charta* is in the following words: "*Nullæ ripariæ defendantur de cœtero, nisi illæ quæ fuerunt in defenso tempore Henrici regis, avi nostri, et per eadem loca et eosdem terminos, sicut esse consueverunt tempore suo.*" Lord Coke's comments on this chapter are as follows: "That is, no owner of the banks of rivers shall so appropriate or keep the rivers several to him, to defend or bar others either to have passage or fish there, otherwise than they were used in the reign of king Henry II. This statute, saith the *Mirror*, is out of use, for many rivers are at present appropriated and fenced in, and put in defence, which used to be common to fish in and use, in the time of king Henry II." From which it will be observed, that the only comment made by Lord Coke is, that the Mirror says the statute *is out of use.* Brief as is this comment, it is not supported by the text. Lord Coke translates the word "ripariæ," *banks.* Instead of banks it should be *rivers ;* (*See Ducange's Glossary, Spelman's Glossary, Jacob's Law Dictionary,* 2 *Inst.* 478 ;) and then the 16th chapter of *magna charta* would read thus : "No rivers shall be defended from henceforth, but such as were in defence in the time of king Henry, our grandfather, by the same places, and the same bounds as they were wont to be in his time." The word defend, as used in that chapter, meant "to prohibit from common use." What defence of rivers, then, was intended in this chapter of *magna charta ?* Lord Coke construes it to mean "the appropriation of rivers *by the owner of the banks,* so to defend or bar others from passage or fishing." But Sir Matthew Hale gives it a very different meaning. He tells

UTICA,
Aug. 1828.

Rogers
v.
Jones.

us in his treatise *de jure maris,* page 7, " that before the stat-
ute of *magna charta,* chapter 16, it was frequent for the king
to put as well fresh as salt rivers *in defenso* for his recreation ;
that is, to bar fishing or fowling in a river, till the king had
taken his pleasure or advantage of the writ or precept *de de-
fensione repariæ,* which anciently was directed to the sheriff,
to prevent riviation in any rivers in his bailiwick." After this
statute (chap. 16) the writs of *ripariorum defensiones* ran thus :
" *Rex Vicecomiti Wigorniæ salutem. Præcipimus tibi, quod
sine dilatione clamari facias et firmiter prohiberi ex parte nostra,
ut nullus de cætero eat ad riviandum in ripariis nostris in balliva
tua, quæ in defenso fuerunt tempore Henrici regis avi nostri ; et
scire facias omnibus de comitatu tuo, qui ab antiquo facere de-
bent pontes ad riparias illas, quod provideant sibi de pontibus il-
lis, ita quod promti sint et parati in adventu nostro quando eis
scire faciemus."* Sir Matthew Hale adds, that afterwards the
writs mentioned particular rivers upon which the king would
take his recreation, as Avon in Worcestershire, &c. The
writ above given, he says, was taken from the records of 20
Henry III., eleven years after the granting of *magna charta,*
chapter 16. The statute must have been then perfectly un-
derstood. The writ uses the very words of the 16th chapter,
and there can be no question that its object was to prevent
*the king* from putting any rivers *in defenso for his recreation,* ex-
cept such as had thus been put in defence in the time of
Henry II., his grand-father, and was not intended to apply to
the owners of the banks of rivers, or any other individuals.
If, however, *the owners of the banks* of rivers were intended
by the 16th chapter of *magna charta,* to be prohibited from
putting them in defence, there is not one word to be found in
the comments of Lord Coke, or any other writer upon this
charter, that it was intended to restrain, or did restrain the
king from granting the lands under the rivers and navigable
waters in his realm, at his will and pleasure.

It is said that all the grants which Sir Matthew Hale has
cited, are prior to the date of *magna charta.* This is not so.
He speaks of several subsequent to *magna charta ;* one made
by Henry III., in the eleventh year of his reign, two years

only after the date of *magna charta ;* (*Hale's Treatise de Portibus Maris, page* 51 ;) three by Edward I. and one by Edward III. (*Idem, pages* 62, 68, 109, 110.) Besides these five grants cited by Sir Matthew Hale, it will be found that in 4 *Charles I.* a grant was made of lands between high and low water mark, in Portsmouth harbor, which, although contested, was not sought to be avoided on the ground of its being contrary to *magna charta.* (2 *Anstruther,* 603.) The case of *Hamilton* v. *Donegall,* (3 *Ridgeway's R.* 267,) shews three different grants of lands lying under navigable waters, and of fisheries in those waters ; one by James I. and two by Charles II., and though this case was fully canvassed in the parliament of Ireland, neither counsel nor judges intimated a suggestion that the provisions of *magna charta* had been violated by those grants.

Chief Justice Fitzpatrick, in support of the decision made by him in *Arnold* v. *Mundy,* (1 *Halstead,* 1 *to* 94,) quotes 1 *Mod.* 105, 6 *Mod.* 73, 1 *Salk.* 357, and 4 *Burr.* 2162. The case in 1 *Mod.* 105, was decided by Lord Hale. It is true his lordship says, " that in an action of trespass for fishing in a river that flows and re-flows, and in an arm of the sea, it is *prima facie* a good justification to say, that the *locus in quo* is *brachium maris in quo unusquisque subjectus Dom. Regis habet et habere debet liberam piscariam ;*" but his lordship also says, that in such a river the right of fishing is *prima facie* common to all, and if any one will appropriate a right to himself, *the proof lieth on his side.* Now, although *prima facie* this right of fishing in the sea and its branches, and in navigable rivers, is common to all, this case admits that an *individual* may have it himself, and may prove that he has it.

6 *Mod.* 73, and 1 *Salk.* 357, report the same case, viz. *Warren* v. *Matthews.* In 6 *Mod.* Lord Holt is made to say, " Every subject of common right may fish with lawful nets, &c. in a navigable river as well as in the sea, and the king's grant cannot bar them thereof." In *Salkeld,* the case is stated to be, that one claimed *solam piscariam* in the river Ex, by a grant from the crown, and there Lord Holt is stated to have said, " The subject has a right to fish in all navigable

waters, as he has to fish in the sea, and a *quo warranto* ought to be brought to try the title of this grantee, and the validity of his grant. In 6 *Mod.* there are two marginal references to support the decision, viz. *Lord Raymond,* 725, and 2 *Salk.* 637, and in *Salkeld* there are four marginal references, viz. *Davies,* 157, *Plowd.* 315, *Coke's Rep.* and 2 *Salk.* 637 ; neither of which, in the most remote manner, bear out the decision, but on the contrary, the case in *Davies* supports a contrary doctrine. From this circumstance, it is presumed that the case of *Warren* v. *Matthews* is mis-reported.

In 4 *Burr.* 2162, it is true Lord Mansfield uses the words quoted by C. J. Fitzpatrick : "In navigable rivers the fishery is common ; it is *prima facie* in the king, and is public ;" but he adds in the next sentence what the chief justice omits : "If any one claims it (fishery in navigable rivers) exclusively, he must shew a right : if he can shew a right by prescription, he may then exercise an exclusive right, though the presumption is against him, unless he can prove such right. Here it is claimed and found ; it is therefore consistent with all the cases, that he may have an exclusive right of fishing, though it be in an arm of the sea. Such a right shall not be presumed, but the contrary *prima facie ; but it is capable of being proved.*" Justice Yates, in the same case, says, " The case of the royal salmon fishery in the river Banne, in Sir John Davies' reports, is agreeable to this, and it is a very good case. It appears by it that the crown may grant a several fishery in a navigable river, where the sea flows and re-flows, or in an arm of the sea." The case in 4 *Burr.*, therefore, is directly at variance with the one in aid of which it was quoted by C. J. Fitzpatrick.

*Blackstone's Commentaries,* 39, does not support the decision in *Arnold* v. *Mundy.* It is said that Sir William expressly asserts, " that all claim of an exclusive right of fishery in a navigable river, founded on the king's grant or on prescription, must reach as far back a Henry II." *Blackstone* is by no means so unqualified ; he distinctly confines his remarks, as to the effect of the prohibition in *magna charta,* to the case of *free fisheries,* such as are unaccompanied by the grant of soil, and does not extend it to *several fisheries,* where the right of

soil is granted with the right of fishery. It is worthy of remark, that the two treatises of Lord Hale, *de jure maris* and *de portibus maris*, remained in manuscript for more than 100 years after they were written, and were not published until 1786. The treatise *de jure maris* is so conclusive, that it cannot admit a doubt that Sir William Blackstone would never have adopted the construction which Lord Coke gave to the 16th chapter of *magna charta*, if he had examined it with the writ *de defensione ripariæ*, and with Lord Hale's explanation of the subject before him.

The king having the full and unrestrained right to grant to the duke of York the absolute property of the waters of the harbor of Oyster-Bay, of the fishery in those waters, and of the soil under the same, exercised that right, as will be seen by reference to the grants in Learning and Spicer's grants, concessions, &c. pages 3 and 41. Sir Edmond Andross, the governor of the duke of York, granted the patent of Oyster-Bay, and by that grant the freeholders and inhabitants of that town acquired an absolute right and title to the lands and premises conveyed by it, and by statute have the power to make rules and regulations for preserving and protecting their common lands, and for directing the use and management of the same. The by-laws are, however, objected to ; first, because one of them is a *prohibition*, and not a regulation ; and secondly, that the penalty is given to individuals, and not to the town. The first answer is, that a by-law may be good in part, though void in part ; and where it consists of several particulars, it is, to all purposes, as several by-laws, though the provisions be thrown together under the form of one law. (2 *Kyd on Corp.* 155.) The second section of the by-law is free from the objection of its being a *prohibition*. It is a mere *regulation*, prescribing the periods within which oysters may be taken ; and on this the judgment may be supported. A more conclusive answer is, that the by-law is strictly conformable to the power granted by the act of 1823, though it may exceed the authority granted by the act of 1813, (2 *R. L.* 131,) under which the plaintiff in error supposed the by-law had been enacted. The words in the act " and the other commons," respecting which rules

and regulations may be made, mean all such property as belongs to the town which may not be considered either *common lands* or *meadows ;* and it may well be intended that the legislature had reference to the common property which certain towns like Oyster-Bay had in harbors and navigable waters lying within the limits of their grants, and in fisheries which had been granted them in those harbors and waters.

No argument can legitimately be drawn in support of the position, that the right over the soil and fisheries in our navigable rivers is vested in the legislature, from the fact that the legislature have, from time to time, passed laws regulating the fisheries ; because such laws have, in repeated instances, been passed regulating the fisheries in places where there could be no doubt that the title to the property was vested in individuals. The right to pass such laws is asserted upon the principle that the right of individuals in any river or creek, private or public, fresh or salt, is subject to the exercise of the sovereign authority of the state, by the enactment of laws for the conservation of fish and fry. (20 *Johns. R.* 90.)

The objection that the by-law of the town of Oyster-Bay cannot be enforced, because their is a legislative prohibition against persons, not being citizens, catching fish in any of the waters of this state, proceeds on the assumption that the power to impose penalties cannot be *concurrent.* On the part of the defendant, it is contended that such power may be concurrent ; and a great variety of instances might be quoted to shew the existence and the exercise of such powers, particularly in regard to penalties imposed by the corporation of New-York, in cases where penalties already existed, created by the legislature of the state ; such as the penalties for servile labor, and exposing articles for sale on Sunday, &c. &c.

The cases cited by the plaintiff in error, decided in this court, instead of supporting him in the positions he has taken, it is conceived, settle principles which directly operate against him, and shew the propriety of affirming the judgment which he seeks to reverse. Thus, in the case of *Palmer* v. *Hicks,* (6 *Johns. R.* 133,) which was an action by the supervisor of Flushing, to recover a penalty imposed by a by-law

of that town for taking clams within the bounds of the town, though the judgment which had been rendered against the defendant was reversed, it was so reversed expressly on the ground that the plaintiff had failed to shew property in the town, in the place where it was alleged the offence had been committed ; but it is clear, that if such right had been shewn, the judgment would have been affirmed. 17 *Johns. R.* 195, and 20 *Johns. R.* 190, are cited for the purpose of shewing that rivers are to be considered navigable as far as the tide ebbs and flows, and that so far the right of *fishing* as well as *navigation* is common to all. It is fully admitted, that as to the right of *navigation,* it does exist even in the case of a grant to individuals, and the doctrine is also admitted as to the *prima facie right of fishing ;* but there is not a word to be found in either of those cases, which intimates that the *prima facie* common right of fishing may not be restrained or taken away by means of a *grant* to individuals or towns. So, also, the principle upon which the decision was made in the case in *Binney,* is against the plaintiff in error ; for had it been shewn in that case that the plaintiff had a grant of the bed of the river, his action would have been sustained.

As to the absurdity which it is said would result from the doctrine, that the town of Oyster-Bay has the right of propriety or soil under the waters of the harbor, inasmuch as they would then have power to demand tolls of vessels entering the harbor for *anchorage,* &c. the answer is, that such absurdity would not exist, because all grants of lands under water are subject to the right of passage of ships and boats. (*Lord Hale's Treatise de Jure Maris, p.* 22.)

*By the Court,* WOODWORTH, J. (After stating the pleadings and the evidence in the cause.) There is a written stipulation that this cause be decided on the merits. The pleadings are somewhat informal ; but arising in a justice's court, we are to consider the case in the same manner as if the plaintiff had stated all the facts of the case in his declaration, and the defendant had demurred to the same. The justice gave judgment for the plaintiff. The defendant appealed to the common pleas, where the judgment of the justice was af-

firmed. We are now called on to determine whether the plaintiff is entitled to recover. The cause has been ably and most elaborately argued by the plaintiff in error and the counsel for the defendant. Several points raised by the plaintiff in error, I deem it unnecessary to consider, having arrived at a conclusion that the cause will depend on the decision of the following questions :

I. Has the plaintiff below shown a title in the town of Oyster-Bay to the premises in question ?

II. If he has, then in consequence of the by-law passed by the town, is the plaintiff entitled to sustain this action ?

I observe preliminarily, that on the first point it will not be necessary to enter upon an extensive field of argument, being of opinion that the principles involved in the decision of *Gould* v. *James*, (6 *Cowen*, 369,) do substantially decide the first question ; but as this point is one of great importance, and some judges, particularly in a sister state, have expressed opinions at variance with the doctrine in *Gould* v. *James*, I will venture to enlage a little upon that case, and very briefly examine the principles upon which this cause must depend.

It is contended by the plaintiff, that the town has no right of property in the lands where the oysters were taken, because the right of soil beneath the water in the harbor of Oyster-Bay never passed by the terms of the patent.

It cannot be doubted, that when a patent or grant conveys a tract of land by metes and bounds, the land under water as well as other land will pass, if the land under water lies within the bounds of the grant. A contrary doctrine would exclude the lands under the water of lakes and streams not navigable. Scarcely a patent ever issued by this state, that does not include one or the other ; and as far as I know, no question has ever been raised on this ground. The authority cited from 2 *Black. Com.* 19, does not bear out the position, but establishes the contrary. The author states, that if a man grants his lands, he grants all his mines, woods, waters, &c. as well as his fields and meadows ; but by a grant of water merely, nothing passes but a right of fishing.

It follows, therefore, if the grant was valid, the town of Oyster-Bay acquired not only a right and title to the land under water, but to the waters themselves comprised within the bounds of the patent. If the doctrine contended for by the plaintiff in error is well founded, there has been great error in the course pursued by the sovereign power of this state ever since it became a free and independent government. It is well known, that numerous grants have been made from time to time by the commissioners of the land office of lands under the waters of the Hudson, all which have proceeded on the ground that it was the undeniable right of the people of this state to make such grants. Until very lately, I have not understood that the power was questioned. It is here proper to observe, that this principle does not at all conflict with the doctrine laid down by writers on national law, who declare the air, running water, the sea, &c. are common property. (*Vattel*, b. 1, *ch.* 23, *sec.* 280, 287. *Grotius*, b. 2, *ch.* 2, *sec.* 3.) The same writers, however, admit that the various uses of the sea near its coast render it very susceptible of property ; and rivers are susceptible of property, because confined in banks. Such places may be appropriated by the people to whom they belong and the productions within reach, in the same manner as the lands they inhabit. (*Azuni*, *part* 1, *ch.* 2, *art.* 1, *sec.* 3.)

If we examine the common law, it will be found to sanction this broad principle, "that the king is the universal lord and original proprietor of all the lands in his kingdom, and that no man doth or can possess any part of it, but what has mediately or immediately been derived as a gift from him to be held upon feudal services." (2 *Bl. Com.* 52. 6 *Com. Dig. D.* 63.) The right of the king extends over all lands, as well such as are covered with water, as such as are not. In England, it hath always been holden that the king is lord of the whole shore. He has the property *tam aqua quam soli* and all profits in the sea, and all navigable rivers. So also he has the property of the soil in all rivers which have the flux and re-flux of the sea, and not the lord of the manor adjoining, without grant or prescription ; and every arm of the sea or

navigable river, so high as the sea flows and re-flows, belongs to the king; but by grant or prescription, a subject may have the interest in the water and soil of navigable rivers. (*5 Com. Dig. Navigation, A. 3, & B.*) Sir *Matthew Hale*, in his treatise *de jure maris*, (*Hargrave's Law Tracts*,) considers this right of the king to consist in a right of jurisdiction and a right of ownership; that a subject may have this right either by the king's grant, and this without question, or by custom or prescription. The king may grant fishing *within* a creek of the sea, or within some known precinct that hath known bounds, though within the main sea, he may also grant that very interest itself, viz. a navigable river that *is* an arm of the sea, the water and soil thereof. (*Sir M. Hale's de Jure Maris, ch. 5, pl.* 17.)

It thus appears, that by the common law, the king was seized of all the lands under the navigable waters of his realm, and entitled to grant and convey them. I do not find by any authority that this right was ever considered a usurpation. It is argued, however, that the exercise of such a power was prohibited by *magna charta*. The 16th chapter of *magna charta*, (9 *Henry III.*) is supposed to contain the prohibition; it is in the following words: " *Nullæ ripariæ defendantur de cætero, nisi illæ quæ fuerunt in defenso tempore Henrici regis, avi nostri, et per eadem loca et eosdem terminos, sicut esse consueverunt tempore suo.*" Lord Coke's comments on this chapter are as follows: "That no owner of the property of rivers shall so appropriate or keep the river several to him, to deprive or bar others either to have passage or fish there, otherwise than they were used in the reign of king Henry II. This statute, saith the *Mirror*, is out of use, for many rivers are at present appropriated and fenced in, and put in defence, which used *to* be common to fish in and use, in the time of king Henry II."

Even upon the supposition that lord Coke was not correct in saying the statute was out of use, I do not perceive any prohibition of the right claimed for the king; and, as far as I can discover, both before and since the reign of Charles II. from whom the duke of York derived his title, the right of the king to grant several fisheries and the lands under waters of

navigable rivers and arms of the sea, has, in England, been considered as well settled.

Sir Matthew Hale, *de jure maris, pl.* 7, has explained the statute of *magna charta*, chapter 16, "that before the statute it was frequent for the king to put as well fresh as salt rivers *in defenso* for his recreation, that is, to bar fishing and fowling in a river, till the king had taken his pleasure or advantage of the writ or precept *de defensione ripariæ*," &c. The object of the statute seems to have been to prevent the king from putting any rivers *in defenso* for his recreation, except such as had been put in defence in the time of Henry II., his grandfather, and was intended to prohibit the exercise of his ancient prerogative for his own personal pleasure, but not applying to the owners of the banks of rivers or any other individuals. Notwithstanding this statute, the king, although restricted as to the occupancy of rivers for his pleasure, was at liberty to grant the land, under the rivers and navigable waters in his realm, at his will and pleasure. Without going into a specification, I only observe, that several grants are stated by Sir Matthew Hale, subsequent to *magna charta*. (*Hale de Portibus Maris, pl.* 51, 68, 109, 110.)

The case in 1 *Modern,* 106, was decided by Lord Hale. He there says, "That in an action of trespass for fishing in a river that flows and re-flows, and in an arm of the sea, it is *prima facie* a good justification to say, that the *locus in quo* is *brachium maris in quo unusquisque subjectus dom. Regis habet et habere debet liberam piscariam,* and if any one will appropriate a right to himself, the proof lieth on his side." This *prima facie* right is undoubted, and may be exercised until an individual proves he has the right, which may be done by grant or prescription. Such is evidently the language of this case. It is true that in *Warren* v. *Matthews,* (1 *Salk.* 357, and 6 *Mod.* 73, the same case,) where one claimed *solam piscariam* by grant from the crown, there is this dictum of Lord Holt : "The subject has a right to fish in all navigable rivers, as he has to fish in the sea." I have looked at the cases referred to in the margin, and do not find that they support the doctrine. Indeed, one of the cases (*Davies,* 57) decides that the king may grant the fran-

chise of a fishery in a navigable river. As the cases in 6 *Mod.* and 1 *Salk.* are very briefly reported, and are not supported by the authorities cited, there is good ground to believe the case itself is mis-reported.

In 4 *Burr.* 2162, *Carter* v. *Murcot*, Lord Mansfield's remarks are in accordance with the view I have taken : he observes, " In navigable rivers the fishery is common ; it is *prima facie* in the king, and is public. If any one claims it exclusively, he must show a right. If he can show a right by prescription, *he may then* exercise an exclusive right, though the presumption is against him unless he can prove such right." And again, that an exclusive privilege of fishing, although it be in an arm of the sea, is consistent with all the cases. Such a right shall not be presumed, but the contrary *prima facie ;* but it is capable of being proved.

Justice Yates remarks on the case in Davies' reports, which is referred to in support of Lord Holt's opinion : He says it is agreeable to the law there advanced, that the crown may grant a several fishery in a navigable river where the sea flows and re-flows, and in an arm of the sea.

I deem it unnecessary to cite other authorities. Many more might be adduced, but enough has been shown to satisfy my mind that the patent of Sir Edmond Andross, emanating mediately from Charles the second, did convey to the inhabitants of Oyster-Bay, all the lands under water within the bounds of that grant, together with the exclusive right of fishing in the waters within the same. The case of *Gould* v. *James,* in 6 *Cowen,* which decides that a several fishery in an arm of the sea where the tide ebbs and flows, may be derived from a grant or prescription, appears to be supported by the concurrent authority of the English law.

The second question may be disposed of in few words. The by-law contains three sections : 1. That no person, not an inhabitant of Oyster-Bay, be allowed to take oysters in the creeks or harbors, under the penalty of $12,50. 2. That no person be allowed to take oysters, but from the 1st November to March 1. 3. Certain persons are named to receive the fines to their own use.

The plaintiff in error contends, that the by-law is void on several grounds: 1. That the town cannot *prohibit*, but may *regulate*; 2. That the penalty is given to individuals. A recovery may be had under the second section, which is clearly a regulation as to the times of taking oysters; and gives the penalty generally without specifying for whose use. If the objection, urged as to the prohibition and appropriation of the penalty were fatal as to the 1st and 3d sections, still the 2d might be valid; for a by-law may be good in part and void for the rest. (2 *Kyd on Corp.* 155.)

This by-law was undoubtedly made under the 5th section of the act to amend the act relative to the duties and privileges of towns, passed March 19, 1813. (*Statutes, vol.* 6, *b.* 207.) By this section, the individuals of every town are authorized to make such prudential rules and regulations as they judge necessary and convenient for the better improving their common lands in tillage, pasturage, or any other reasonable way, and protecting the same from any trespass; for directing the use and management, and the times and manner of using their common lands and meadows, and *the other commons*, and impose penalties on the offender, whether he resides within the town or not, not exceeding $12,50; and the penalties so recovered shall be applied in such manner as the inhabitants of the town shall direct. This act extended to the regulation of the common property of the town, of which the premises in question are presumed to be a part. The inhabitants for whose benefit the grant was made, have treated it as such in the by-law, and there is no evidence that any individual has an estate in severalty in the same.

The legislature have at various times passed laws regulating fisheries, and declaring certain streams public highways. This right is not inconsistent with the claim of an individual, that he owns the fishery, or the soil under the water. In *Cooper* v. *Cummings*, (20 *Johns. R.* 90,) chief justice Spencer observes, " These will prove nothing, for the legislature has confessedly the right of regulating the taking of fish in private rivers, and do every year pass laws for that purpose,

as to rivers not navigable in any sense, and which are unquestionably private property."

It is admitted, that notwithstanding a grant to an individual, the public have an interest in the waters granted. Lord Hale has accurately defined it, (*de jure maris, p. 22.*) Speaking of the private interest of the subject, he observes, "this interest or right must be so used, as that it may not occasion a common annoyance to passage of ships or boats; for the *jus privatum* must not prejudice the *jus publicum*, wherewith public rivers or arms of the sea are affected for public use. 2. That the right a subject hath in any public or private river or creek, fresh or salt, is subject to the laws for the conservation of fish or fry." The individual right, then, is subject to the interference of the legislature, to the extent before mentioned, but no farther. Such laws, therefore, are no invasion of the right of the individual; his right is not absolute and unlimited over the property granted, but qualified by these implied reservations.

But it is said that the by-law of a town or a corporation is void, if the legislature have regulated the subject by law. If the legislature have passed a law, regulating as to certain things in a city, I apprehend the corporation are not thereby restricted from making further regulations. Cases of this kind have occurred, and never been questioned on that ground; it is only to notice a case or two out of many. The legislature have imposed a penalty of $1, for servile labor on Sunday; the corporation of New-York have passed a by-law, imposing the penalty of $5 for the same offence. As to storing gunpowder in New-York, the legislature and corporation have each imposed the same penalty. Suits to recover the penalties have been sustained under the corporation law. It is believed that the ground has never been taken, that there was a conflict with the state law. One of these cases is reported in 12 *Johns. R.* 122. The question was open for discussion, but not noticed. If it be admitted, that when the legislature had passed a law regulating the fishery, it would not be competent for the town to pass a by-law, the answer here is, that the legislature have not legisla-

ted on the case before us; for the act (4 *vol. L.* 248) which prohibits persons *residing out* of this state from taking shell or other fish in any of the waters of this state, does not apply. Here it is admitted that the plaintiff in error is a citizen of this state. There being then no conflict of regulation, it will scarcely be contended, that after the legislature in 1823 had expressly delegated to the towns the power of regulation, the by-law passed in pursuance of it is a nullity. Upon the whole case, I am of opinion that the judgment of the court below be affirmed.