Desmond, J.
This protracted and elaborate litigation calls for answers to two closely related questions: who has the title to “ Dam A ” in the Ticonderoga River in Essex County, New York, and by whom and to what extent may the operation of that dam be regulated so as to affect the water level of Lake George? Ticonderoga River (or Creek) is the only outlet of Lake George and flows in a northerly direction about 3% miles, with a drop of some 220 feet, to its outlet in Lake Champlain. Lake George is 33 miles long, about % of a mile to 3 miles wide. Its clear waters are dotted with islands and surrounded by the picturesque scenery of the Adirondack foothills. At its foot where it empties into Ticonderoga River there is a 400-foot-long natural rock formation known as Natural Dam beyond which there is a relatively level stretch of river. About % of a mile further down is the so-called Upper Palls, first of a series of waterfalls in Ticonderoga River. Dam A, the subject matter of our lawsuit, is of masonry construction about 83 feet long, and is about a foot higher without flashboards than the Natural Dam. Built upon the brink of Upper Palls in 1903, it is operated and maintained by Trustees of Dartmouth College (substituted for original defendant System Properties, Inc., which in turn had succeeded the builder of the dam). The trustees not only assert ownership of the dam, but assert, too, that the river is nonnavigable in fact and law, that the Dartmouth trustees own in fee the river bed on which the dam stands and that the Dartmouth trustees have, as against plaintiff State and all riparian owners on Lake George, a valid prescriptive right of flowage against the lands on the shores and islands of Lake George. On sufficient proof it has been found by both the trial court and the Appellate Division that a number of dams have successively stood at the approximate present site of Dam A continuously since about the year 1798. It was found by both courts on abundant proof that Dam A ‘ ‘ has the effect of raising the level of the water of Lake George about one foot and one half above the level which would otherwise have obtained”. The Appellate Division’s opinion makes these additional findings: ‘ ‘ The dam serves the function of holding back the waters of Lake George and converting it in effect into an enormous reservoir. The waters of the spring floods are stored for use in the drier seasons. This helps to stabilize the water level of the lake and also aids in the develop *338 ment of water power at the dam site The record shows disputes as to the fact and extent of damage caused by the dam’s flooding operations to the shores and islands of the lake and interference with the enjoyment of the waters by homeowners along the lake, but neither court below made findings of fact in this connection.
This action was brought by the State of New York in 1942 against System Properties, Inc., then the operator of the dam. Seven individual owners, called herein the “ Langmuir ” group of intervenors, of homes on Lake George intervened on plaintiff’s side. Other intervenors were three counties, seven interested townships, the Tillage of Ticonderoga, Elizabeth Brereton, a riparian owner on Lake George, and the Lake George Association, the latter’s membership being about 800 owners of riparian real estate in the Lake George area.
The People’s complaint alleged that both Lake George and Ticonderoga River are public navigable waters of the State of New York, that the operation of the dam has damaged and destroyed property of both the State and private owners in and along Lake George and has interfered with navigation and enjoyment of the lake’s waters, resulting in a public nuisance. The complaint’s prayer for judgment demanded that the dam itself be ordered removed, a demand which the State withdrew at the opening of the trial with the concurrence of all parties except the seven “ Langmuir ” intervenors-plaintiffs who continue to press that demand. The further demands of the State were and are that the State be declared to be the sovereign owner and the owner in fee of the bed of the Ticonderoga River including this dam site, that Lake George, Lake Champlain and the Ticonderoga River are all public navigable waters and that the State possesses and is bound to exercise the reserve power to regulate and control, in the public interest, the waters of Lake George and the Ticonderoga River. Defendant System Properties, Inc. (later succeeded in interest by present defendants-appellants-respondents Dartmouth trustees), asserted that it, the dam operator, either by grant or adverse possession owns the dam site, and has a valid prescriptive right of flowage and that the river is a nonnavigable minor stream. The various intervenors, other than the Langmuir group above mentioned and the Lake George Association, have not appealed from the Appellate Division’s determination and so are not parties in this court. *339 The Lake George Association, whose members are interested in keeping the Lake George level at a height which will protect the lake’s beanty and enhance its nse and enjoyment, argne in this court that the Appellate Division should not have stricken out so much of the trial court’s decision, hereinafter described, as in effect fixed the upper and lower levels between which Lake George’s waters must be kept.
Both courts below wrote careful, able and comprehensive opinions (189 Misc. 991; 281 App. Div. 433). The two courts were in agreement as to the history of the dams and as to title to the river bed at the site of the dam being in System (now Dartmouth). The two courts differed as to whether the river was navigable, Trial Term giving a negative and the Appellate Division an affirmative answer to that question. The Appellate Division held with the State in the latter’s contention that it has a sovereign or reserve power, paramount and not subject or subordinate to any prescriptive right of the dam operator, to control and regulate the waters and water level of Lake George by regulating the use and levels of the Ticonderoga River and that the operation of Dam A is subject to that sovereign power of the State, which power may be exercised in the public interest not only as to production of water power but in relation to recreational and other uses of Lake George. Trial Term did not directly affirm or deny the existence of such power. Trial Term did make a determination as to what it considered to be under all the circumstances the “ most advantageous ” water level of Lake George, fixed that level between upper and lower limits, announced a plan for maintaining those levels during the summer months, appointed the State Superintendent of Public Works as the court’s agent for seeing to it that its directives were carried out, and retained jurisdiction in the Supreme Court to enforce or modify the judgment. The Appellate Division struck out those provisions of the Trial Term judgment which had determined the most advantageous levels for Lake George and which designated the State Public Works Superintendent as the Supreme Court’s agent, etc. It was the holding of the Appellate Division that the State’s sovereign power over the waters of Lake George and Ticonderoga River could be exercised for the State by the Legislature or its designated officer or agent only and not exercised by any court or enforced by any individual riparian owner. The judgment entered on the Appel *340 late Division’s order determined that the Ticonderoga River was a navigable stream, title to the bed of which at the dam site is owned by defendant Dartmouth, and that the State has complete sovereign power over the water levels of the lake and river but that fixation of such levels or other governmental control is a legislative power.
We will now take up three questions: first, title to the river bed; second, navigability of the river, and, third, power of the State to control and regulate the use of Lake George and its outlet stream, the Ticonderoga River.
First, we deal with the question, answered in the affirmative by both lower courts: does System (Dartmouth) own the title to the river-bed lands under the dam! This, it is clear, is a question different from that of navigability since under New York law the bed of such a stream as the Ticonderoga River is subject to private ownership, regardless of navigability (Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400, 412; see Appleby v. City of New York, 271 U. S. 364). The dam operator’s opponent on this issue of river-bed title is the State which says that it (the State) is the owner as successor to the rights of the British Crown and that System (Dartmouth) has no record title to the lands under water and has not and could not perfect title thereto by adverse possession.
We first turn to the dispute as to whether System (Dartmouth) has record title or title by grant to the river bed at this place. The existence of such title was found affirmatively by the Trial Term and by the Appellate Division. In July, 1764, King George III made and delivered to John Stoughton, a subaltern in the King’s armed forces, because of services rendered by Stoughton to the Crown in the French and Indian Wars (see Van De Water, Lake Champlain and Lake George, p. 128), a patent of lands described therein as two parcels along the Ticonderoga River and Lake George. It is not disputed that the two parcels included lands on both sides of the river including the land at each end of the dam which was about the year 1798, it would seem, built by Stoughton’s successors just about where Dam A now stands. The question here elaborately litigated is as to whether the metes-and-bounds descriptions in that ancient patent included or excluded the river bed. The first description begins at a tree “ on the West Bank of Lake George ”, then runs west, then northeast (we omit distances) *341 then southeast, to “ the NorthWest side ” of Tioonderoga River, “ then Southwesterly and Southerly along the Banks of the said River ” to a certain point, then “ along the Bank ” of the river a certain distance, then by certain directions and distances ‘ ‘ to the banks of the said Lake George ” and “ along the Banks ” of the lake to the place of beginning. The second description began where the course of the first description on reaching the banks of the river “ will cross ” the river and runs thence “ along the Banks ” of the river to a point near the high falls, then southeast, northeast and northwest certain distances back to the river, then “ down along the South Bank ” of the river; etc., etc. The State stresses the significance of the use, no less than five times in those descriptions, of the phrase “banks of the river ”. That language, argues the State, requires the application here of the rule of Fulton Light, Heat & Power Co. v. State of New York (200 N. Y. 400, 417, supra) and White v. Knickerbocker Ice Co. (254 N. Y. 152, 157) that (with some exceptions not here pertinent) if a land description runs “ along the bank ” of a stream, it excludes title to the stream bed and carries only to the shore or bank. System (Dartmouth) disputes the applicability hereto of those settled rules. The dam owner reminds us that the Stoughton grant came from the English Crown and asserts that English law is applicable and that by English law such a description conveys the bed of the stream. It seems clear enough that according to English common law as of about 1764 the owner of land on each side of a nontidal river (otherwise as to tidal waters, Rogers v. Jones, 1 Wend. 237, 256) owned to the center of the stream and if he owned the land on both sides he owned the whole river unless his grant specifically and in terms excluded the bed (Lord Hale, De Jure Maris, ch. 1; 1 Farnham on Waters and Water Rights, § 48, pp. 237-240; King v. Wharton, Holt K. B. 499, 90 Eng. Rep., p. 1175 [1701]). But we read the New York cases as saying that there is (with certain exceptions not here pertinent) no real difference in this respect between the English and American colonial law and the modern law of NeAV York State (see, generally, Danes v. State of New York, 219 N. Y. 67, 72 et seq.). The early New York cases of Luce v. Carley (24 Wend. 451, 453 [1840]) and Child v. Starr (4 Hill 369, 373 [1842]) restate the holdings of the English cases and texts that a grant runs to the middle of a river when the granted land in terms touches the water and *342 when there is no express inclusion or exclusion of the bed. But the modern-day New York rule of Fulton Light, Heat & Power Co. v. State of New York and White v. Knickerbocker Ice Co. (supra) is a formalization and formalized statement of that same old rule. All the cases mean this: that a grant of the stream bed is ordinarily presumed (see Stewart v. Turney, 237 N. Y. 117, 121, 127) but that running a boundary line along the bank of the stream results in an exclusion of the land under water. There is material in this record, such as the terms of the Schuyler and other nearby grants, the occupancy of the river bed by Stoughton’s successors and the absence of any suggestion of a reason for exclusion, to suggest that all concerned may have actually intended or assumed that Lieutenant Stoughton owned that piece of river. However, the decisions make the language of the particular (Stoughton) grant controlling (Rogers v. Jones, 1 Wend. 237, 256, supra; Lowndes v. Huntington, 153 U. S. 1, 21; Loch Sheldrake Associates v. Evans, 306 N. Y. 297, 304, 305). We, therefore, consider ourselves bound to hold as matter of law that the Stoughton grant excluded all lands under water.
Now, we examine into the assertion by System (Dartmouth) of title by prescription or adverse possession, an issue not decided by the Appellate Division but adjudicated by the Trial Term in favor of System (Dartmouth). It is the found fact (see discussion in an earlier part of this opinion) that dams have stood at the present site of Dam A for 160 years. That lapse of time would ordinarily give the dam operator title by adverse possession, against the State and everyone else, to the land under the dam (Civ. Prac. Act, § 31). But, says the. State, the State’s post-Revolution title to the land and the stream was sovereign ownership, in trust for the People and so inalienable. Whether title by adverse possession can ever be successfully claimed as to lands actually so held in trust by the State and appropriated to public uses by the State seems never to have been flatly decided by the New York appellate courts (Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400, 420, 422, 423, supra; Hinckley v. State of New York, 234 N. Y. 309, 315, 316). The rule appropriate to some situations is that a grant to a private individual may not be presumed or adverse possession adjudicated as to lands theretofore appropriated to a public use by the State since such lands are inalienable *343 (Burbank v. Fay, 65 N. Y. 57, 66 et seq.). But for several reasons that rule is inapplicable here. First, this dam standing upon this rocky ledge in the river is at a place where its existence (as distinguished from its operation) interferes with no public use (See Rumsey v. New York & New England R. R. Co., 130 N. Y. 88, 93). Second, the State itself, in 1789 after the Revolution, conveyed to Philip Schuyler by express description part of the Ticonderoga River bed north of this dam site. Taken together, these historical facts plus the maintenance for much over a century of the several dams preceding and including Dam A show that, for that very long period of time neither the State nor its grantees considered that the State held sovereign trust title to the bed of this river (as distinguished from its sovereign title to Lake George and as distinguished from its sovereign power and right to regulate the use of both the lake and the river). Adverse possession always rests on the presumption of a lost grant. A grant of these underwater lands to Stoughton would not have been illegal. Adverse possession by Stoughton’s successors commenced soon thereafter and continued. Accordingly, we hold that title by adverse possession was established here. Lack of a finding thereon by the Appellate Division does not foreclose us from this adjudication, since the necessary facts are either found by both courts or are undisputed.
Although both the lower courts passed on the question of navigability of the river, we consider that, in view of the other determinations with which we agree, a decision on navigability is in this situation neither necessary nor appropriate. We are holding herein, as explained below, that Dartmouth owns the dam site but that the State of New York has power to regulate the use of Lake George and the Ticonderoga River in the public interest. Those ultimate holdings are not affected by and do not depend on navigability or nonnavigability. We, therefore, modify the judgment appealed from by striking out the finding of fact numbered 7 and the conclusion of law numbered 6 in the judgment of reversal.
As to regulation of the river and the dam, Trial Term, as explained above, decided what were the optimum low and high levels for the lake, ordering the levels maintained at about the marks agreed to in a so-called “Gentlemen’s Agreement” made in 1935 between the State, the dam operator and the Lake *344 George Association, which levels had been recommended, also, in 1945 by a Joint Legislative Commission (see N. Y. Legis. Doc., 1945, No. 67). The Appellate Division, however, denied the existence of any power in the courts so to undertake the direct regulation and control of the waters. State power in this respect, said the Appellate Division, resides in the Legislature. We read the trial court’s judgment as did the Appellate Division, that is, as a permanent determination of the respective rights of all the parties, not some mere temporary expedient to prevent irreparable damage (as to the validity of which relief in those circumstances we express no opinion). And, besides setting forth those rights, the trial court made a direction apparently intended to be permanent as to the method and extent of control to be exercised over the water levels. Such determinations must come, if at all, from the Legislature (1 Farnham on Waters and Water Eights, pp. 370, 399; Bedlow v. New York Floating Drydock Co., 112 N. Y. 263, 274; People v. Delaware & Hudson Co., 213 N. Y. 194, 202; 1945 Assembly Bill, Int. No. 1264, Pr. No. 2034, and the Governor’s veto message thereon in 1945 Legis. Index, p. 659). The sovereign character of the State’s power as to these waters negates any authority in the courts to exercise such control as was expressed in the lower court’s judgment. We find no similar prior New York decision. And power in the courts is not supplied by the fact that the State itself brought the suit. With its prayer for removal of the dam stricken from its complaint, the State was asking not for direct control by the court but for declarations as to ownership, rights and power. Such declarations are found in the Appellate Division judgment, and no more than that was presented for decision on this record. Nothing herein, of course, limits in any way the traditional equitable power of the courts, on appropriate evidence and findings, to protect riparian owners against illegal and damaging acts of others.
As to the existence of the sovereign power of the State as declared by the Appellate Division we have no doubt (see People v. New York & Staten Is. Ferry Co., 68 N. Y. 71). Lake George is a large (44 square miles) and important public body of water, title to which and sovereign power over which is in the State (Granger v. City of Canandaigua, 257 N. Y. 126, 130). The reach of that power in trust for the People is as great as the uses and possibilities of the lake for navigation, as a water *345 power reservoir and not excluding recreational uses (see Hudson Water Co. v. McCarter, 209 U. S. 349, 356, 357; see Granger v. City of Canandaigua, supra, p. 131). Exercise of those rights includes control of the river and, as against this sovereign right and responsibility, the dam operator could never acquire any such prescriptive rights as would interfere therewith (Matter of Long Sault Development Co., 212 N. Y. 1, 9, 10). To say that Dartmouth has by prescription or otherwise established a right to back up the lake waters would be to deprive the State of its inalienable right (Niagara Falls Power Co. v. Water Power & Control Comm., 267 N. Y. 265; Matter of Long Sault Development Co., supra). The trial court’s plan was probably a fair and practicable one and the invalidation thereof by the Appellate Division leaves a vacuum as to control, but expediency cannot transfer legislative power to the courts.
We agree, too, with the Appellate Division that by reason of the substantially continuous flooding caused by the dam for at least the time of existence of the present dam, the riparian owners have lost their former right to prevent such flooding (see Taylor v. State of New York, 302 N. Y. 177). But the State’s own rights being sovereign in character remain unimpaired and there is no reason to suppose that the Legislature will neglect to exercise them as its collective judgment dictates.
Perhaps enough has been said above to answer the continued demand of the intervenors Langmuir et al. that the dam be ordered removed as a “ nuisance ”. Furthermore, the State, as well as all the counties and towns adjacent to Lake George and all the owners except the Langmuir group, takes the position that removal would, be not beneficial but disastrous to all concerned because of the resulting lowering of the Lake George level at all seasons of the year. Thus, Langmuir et al., even if they had not lost by lapse of time their rights as against flooding by dam operations, would have no absolute right to a mandatory injunction against the dam. Denial thereof would be discretionary with the court (McCann v. Chasm Power Co., 211 N. Y. 301, 306).
We pass on no questions not discussed herein.
The judgment should be modified by striking therefrom the first sentence in finding of fact No. 18 and the first sentence in conclusion of law No. 20 and by substituting therefor statements that title to the bed of Ticonderoga River at or about the site of Dam A is in defendant °opellants Trustees of Dart *346 mouth. College by adverse possession, and the judgment should further be modified by striking therefrom the whole of finding of fact No. 7 and conclusion of law No. 6; otherwise affirmed, without costs.