In the Matter of LUMPKIN SAND
AND GRAVEL, INC., Debtor.

KAL–O–MINE INDUSTRIES, INC., and
Lumpkin Sand and Gravel,
Inc., Plaintiffs,

v.

Wilson M. CAMP, II, Defendant.

In the Matter of CAMP LIGHTWEIGHT,
INC., Debtor.

KAL–O–MINE INDUSTRIES, INC., and
Lumpkin Sand and Gravel,
Inc., Plaintiffs,

v.

Wilson M. CAMP, II, Defendant.

Bankruptcy Nos. 87–40005–COL,
85–40160–COL.
Adv. Nos. 89–4033, 89–4034.

United States Bankruptcy Court,
M.D. Georgia,
Columbus Division.

Aug. 25, 1989.

**530**

Jerome L. Kaplan, Wesley J. Boyer, Macon, Ga., for Lumpkin Sand and Gravel, Inc. and Kal–O–Mine Industries, Inc.

James A. Elkins, Jr., Columbus, Ga., for Wilson M. Camp, II.

Stephen M. Bailey, Denver, Colo., for Ventures Plus.

Ernest Kirk, II, Columbus, Ga., for Trustee.

## STATEMENT OF THE CASE

ROBERT F. HERSHNER, Jr., Chief Judge.

Camp Lightweight, Inc., Debtor ("Camp Lightweight"), filed a petition under Chapter 11 of the Bankruptcy Code on March 22, 1985. Camp Lightweight filed a disclosure statement on March 20, 1986. An addendum to the disclosure statement was filed and approved by the Court on April 23, 1986. A second addendum was filed on May 8, 1986 and approved on May 15, 1986.

Camp Lightweight filed an amended plan of reorganization on June 23, 1986. A modification of the amended plan was filed on August 19, 1986. The Court entered an order confirming the plan on August 19, 1986.

Lumpkin Sand and Gravel, Inc., Debtor ("Lumpkin Sand"), filed a petition under Chapter 11 of the Bankruptcy Code on January 6, 1987. Lumpkin Sand filed its disclosure statement and plan of reorganization on March 2, 1988. The Court approved the disclosure statement on March 31, 1988. Mr. Wilson M. Camp, II, Defendant, filed an objection to confirmation of the plan on April 20, 1988. On September 9, 1988, the Court entered an order overruling Defendant's objection and ordered that Defendant be forever barred from claiming ownership of certain property which Defendant had conveyed to Kal–O–Mine Resources, Inc. Kal–O–Mine Industries, Inc. ("Kal–O–Mine"), the sole shareholder of Lumpkin Sand, filed a disclosure statement and plan of reorganization on September 20, 1988, which adopted Lumpkin Sand's disclosure statement and plan. The plan was orally modified at the confirmation hearing on September 26, 1988. The Court conditionally confirmed the plan on November 17, 1988. On January 13, 1989, the Court entered an order determining that Lumpkin Sand is the owner of a certain 579.66–acre tract of land in Muscogee County, Georgia, bordering on the Chattahoochee River (the "Lumpkin property").

On April 6, 1989, Kal–O–Mine and Lumpkin Sand, Plaintiffs, filed a "Complaint for Declaratory Judgment, for Damages, and for Preliminary and Preliminary Injunctions" ("Complaint") against Defendant. Kal–O–Mine and Lumpkin Sand filed an adversary proceeding in the Lumpkin Sand case and one in the Camp Lightweight case. The two adversary proceedings are exactly the same and seek the same relief from Defendant. The Court joined the two adversary proceedings for trial. Kal–O–Mine alleges that it owns all real and personal property and equipment leases previously owned by Camp Lightweight. Lumpkin Sand alleges that it owns the riverbed

and minerals in and under the riverbed adjoining the Lumpkin property to the extent the riverbed and minerals may be privately owned. Lumpkin Sand claims it owns all the fixtures, equipment, and other personal property on the Lumpkin property.

Kal–O–Mine and Lumpkin Sand allege in their adversary proceedings that Defendant has interfered with their business and reorganization plans by telling third parties that Defendant owns the real estate and personal property. They ask the Court to declare that they own the real estate, riverbed, and personal property, to enjoin Defendant from asserting a claim of ownership to said property, to enjoin Defendant from interfering with Lumpkin Sand's and Camp Lightweight's plans of reorganization, and to award damages for Defendant's liable and slander concerning title to said real estate.

Kal–O–Mine and Lumpkin Sand filed an amendment to their complaint on April 24, 1989. The amendment asks the Court to award them damages for conversion of property for minerals and topsoil removed from the Lumpkin property. Defendant timely filed his answer on May 26, 1989.[1] A hearing was held on April 25, 1989. The Court entered an order on April 26, 1989 which preliminarily enjoined Defendant in accordance with oral instructions issued by the Court in open court at the conclusion of the hearing held on April 25, 1989.

Kal–O–Mine and Lumpkin Sand filed a Motion for Preliminary Injunction on May 26, 1989. They allege that following the issuance of the Court's order on April 26, 1989, someone under the direction of Defendant entered their Ft. Gaines property.[2]

A trial on both adversary proceedings was held on June 23, 1989. At the conclusion of the trial, the Court invited all parties to submit briefs on the matters in issue. This opinion only addresses the limited issues of ownership of the riverbed, ownership of the personal property on the Lumpkin property, and ownership of the Camp Lightweight property. The Court reserves its decision concerning Kal–O–Mine and Lumpkin Sand's demands for actual damages, punitive damages, and other remedies. The Court, having considered the arguments and briefs of counsel and the evidence presented at trial, now publishes its findings of fact and conclusions of law.

## FINDINGS OF FACT

Mr. John William Cooper conveyed a tract of land in Muscogee County, Georgia, to Defendant[3] by deed dated June 1, 1961 (the "Cooper Deed"). The deed described the land as containing 679.58-acres, more or less, lying in one body and composed of six contiguous tracts. Tracts one through five are near or bounded by the Chattahoochee River. Tract six is the riverbed of the Chattahoochee River, which bounds some of the other tracts described in the deed. The riverbed described in Tract six extends to the Georgia–Alabama State line. On January 5, 1986, Defendant entered into an agreement with Kal–O–Mine Resources, Inc.[4] to convey the land described in the Cooper Deed to Kal–O–Mine in exchange for three million shares of Kal–O–Mine common lettered stock. Defendant conveyed Tracts one through five of this land to Kal–O–Mine by deed dated January 23, 1986 (the "Camp Deed"). The deed describes the land as containing 579.66 acres,[5]

---

1. The Court granted Defendant an extension of time to file his answer.

2. The Ft. Gaines property is located in Clay County, Georgia, and will be referred to in the opinion as the Camp Lightweight property.

3. Wilson M. Camp, the grantee in the Cooper Deed, is the same person as Wilson M. Camp, II, Defendant.

4. Kal–O–Mine Resources, Inc. is the predecessor of Kal–O–Mine Resources Industries, Inc. The

complaint names Kal–O–Mine Industries, Inc. as Plaintiff. All three names refer to the same corporation. The Court will simply refer to the corporation as "Kal–O–Mine" unless a distinction among the names is important.

5. Defendant conveyed 99.92 acres of Tract Two to Camp Concrete Industries, Inc. by deed dated July 24, 1981. Defendant subsequently conveyed the same 99.92 acres to Kal–O–Mine Resources, Inc. by quitclaim deed dated January 23, 1986. Ownership of this tract is not at issue in this adversary proceeding.

more or less, lying in one body and composed of five contiguous tracts. The land, in part, is bounded by the Chattahoochee River on three sides. The Camp Deed neither included nor specifically excluded the riverbed from the conveyance.

Kal–O–Mine conveyed the Camp Deed property to Lumpkin Sand by deed dated December 29, 1986. Kal–O–Mine owns one hundred percent of the stock of Lumpkin Sand. Located on this land (the "Lumpkin property") are a dredge, several trucks, various pieces of equipment, and scrap iron. These items are not listed in the deed. No bill of sale or other document of title was executed covering these items.

Camp Lightweight's amended plan of reorganization was signed by Defendant as president of Camp Lightweight. The disclosure statement was also signed by Defendant.[6] Kal–O–Mine executed an agreement on January 5, 1986[7] to acquire one hundred percent ownership and control of Camp Lightweight.[8] Under Camp Lightweight's amended plan of reorganization confirmed by the Court, Kal–O–Mine is to retain one hundred percent ownership following reorganization. The plan states that Kal–O–Mine has completed a registration statement for a $2.5 million preferential stock offering, the proceeds of which are committed to investment into and reorganization of Camp Lightweight. Title to the assets of Camp Lightweight is to be assigned and transferred to Kal–O–Mine on the distribution date. The plan also states that Kal–O–Mine has contracted with Defendant to continue his employment to manage the day-to-day, nonfinancial operation of Camp Lightweight under the ownership, direction, and complete supervision of Kal–O–Mine.

6. The first and second addendum to the disclosure statement and the modification to the confirmed plan were not signed by Defendant.

7. Camp Lightweight's petition under Chapter 11 was filed on March 22, 1985.

8. The shareholders of Camp Lightweight, Inc. changed the name of the corporation to Claylite, Inc. on May 15, 1986. The Court will simply refer to the corporation as "Camp Lightweight" unless a distinction between the names is important.

Kal–O–Mine offered Defendant an employment contract. Defendant made several changes in the contract and returned it to Kal–O–Mine. Defendant's changes included striking the provisions that he would not be responsible for financial management of Lumpkin Sand and that he could be discharged for disloyalty or inattention to duties.

## CONCLUSIONS OF LAW

The two adversary proceedings before the Court concern the ownership of real and personal property in two separate but related bankruptcy cases. The Court first will address the property involved in the Lumpkin Sand bankruptcy case. This property is located in Muscogee County, Georgia. The Court then will address the property involved in the Camp Lightweight bankruptcy case. This property is located in Clay County, Georgia.

I. *Ownership of the Riverbed Adjacent to the Lumpkin Property.*

Lumpkin Sand and Defendant both claim ownership to the riverbed and the minerals in and under the riverbed (the "riverbed")[9] adjoining the Lumpkin property. Defendant claims title under a deed from John William Cooper dated June 1, 1961 (the "Cooper Deed"). The riverbed is described in Tract six of the Cooper Deed. Defendant contends that he never conveyed the riverbed to Kal–O–Mine.

Kal–O–Mine claims to have held title to the riverbed under a deed from Defendant to Kal–O–Mine dated January 23, 1986 (the "Camp Deed"). Kal–O–Mine claims it conveyed title to the riverbed to Lumpkin Sand[10] by deed dated December 29, 1986.

9. The Court's opinion is limited to ownership rights in the riverbed as between the parties. Neither party has provided the Court with original or certified copies of deeds and grants to prove that either party actually owns the riverbed. The Court is judicially ignorant, therefore, of the contents of those deeds and grants.

10. As previously stated, Kal–O–Mine owns one hundred percent of the stock in Lumpkin Sand.

Lumpkin Sand thus claims title to the riverbed.

Resolution of title to real property acquired by deed hinges on state law. Kal-O-Mine argues that, by construction of law, the Camp Deed conveyed the riverbed. Kal-O-Mine also argues that the parties intended that the riverbed be conveyed. Kal-O-Mine and Lumpkin Sand argue that title passed to Lumpkin Sand when Kal-O-Mine executed the deed on December 29, 1986. Defendant argues that the parties did not intend that the Camp Deed convey the riverbed. The Court will analyze ownership of the riverbed both by construction of the deed and by intent of the parties.

(a) Construction of the Deed

■ The general rule concerning the rights of abutting land owners in navigable rivers is stated in section 44-8-5(b) of the Official Code of Georgia,[11] which provides: "(b) The rights of the owner of lands which are adjacent to navigable streams extend to the low-water mark in the bed of the stream." O.C.G.A. § 44-8-5(b) (1982). "[B]ut state grants prior to the Code of 1863 have been construed as conveying title to the adjoining riverbed by mere reference to the river as one of the boundaries of the grant." G. Pindar, *Georgia Real Estate Law* § 6-10 (1986) (citation omitted). The parties stipulated that the section of the Chattahoochee River covering the riverbed was navigable at all times relevant to this issue.

The Camp Deed describes the property conveyed as being bounded, in part, on three sides by the Chattahoochee River. There is no clear indication of intent on the face of the deed to reserve the riverbed from the conveyance. Neither Lumpkin Sand nor Defendant has cited a Georgia case which explicitly holds that a private grant of land bounded by a navigable river either does or does not convey title to the adjacent riverbed.

Courts in other jurisdictions have held, almost exclusively, that the use of the phrase "bounded by" conveys title to a riverbed, unless there is a clear indication

of an intent by the grantor to reserve title to the riverbed. *See generally* 12 Am. Jur.2d *Boundaries* § 21 (1964) (Grants by private persons of land bounded upon navigable waters are presumed, in the absence of anything to the contrary indicated in the conveyance, to be intended to convey all land owned by the grantor); Annotation, *Deeds: Description of Lands Conveyed by Reference to River or Stream as Carrying to Thread or Center or Only to Bank Thereof—Modern Status*, 78 A.L.R.3d 604, 607 (1977) (It is generally presumed that a grantee acquires whatever land under a watercourse was owned by grantor, in the absence of language expressly or impliedly reserving from the operation of the deed some portion of the grantor's land.); Annotation, *Specific Description with Reference to Water, in Conveyance of Riparian Land, as Marking the Extent of Grantee's Ownership of the Submerged Land and the Shore*, 74 ALR 597, 600-01 (1931) (Descriptions running the boundary by a river have generally been regarded as extending to embrace the land to the thread of the water. In states where the beds of navigable waters are subject to private ownership, there seems to be no reason why the rules applied to conveyance of the beds' nonnavigable waters should not be applied.); (*Bradford v. United States*, 651 F.2d 700, 706 (10th Cir.1981) (Absent a clear indication of contrary intent, a grant conveys title to the bed of the stream.); *Choctaw and Chickasaw Nations v. Seay*, 235 F.2d 30, 35 (10th Cir.), *cert. denied*, 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123 (1956) (A grant of land bounded on a nonnavigable river by a grantor who owns to the center or thread of the stream conveys the land under the stream, unless the terms of the grant and the attendant circumstances clearly denote an intention to stop at the edge or margin of the river.); *Fruin-Colnon Corp. v. Vogt*, 500 F.Supp. 606, 612 (S.D.Ill.1980) (Riparian land owners hold title to the middle of the main channel of the Mississippi River in Illinois. It is not necessary that the deed recite title to the bed but rather title rests

---

11. O.C.G.A. § 44-8-5(b) (1982).

automatically, absent a clear statement to the contrary.); *People v. System Properties, Inc.*, 2 N.Y.2d 330, 160 N.Y.S.2d 859, 141 N.E.2d 429 (1957) (A grant runs to the middle of a river when the granted land in terms touches the water and when there is no express inclusion or exclusion of the bed.); *White v. Knickerbocker Ice Co.*, 254 N.Y. 152, 172 N.E. 452 (1930) (A description which runs the boundary by the river carries title to the center absent a clear and express restriction of the title to the upland.); *Smith v. Bartlett*, 180 N.Y. 360, 73 N.E. 63 (1905) ("When a deed describes lands so bounded by a river, which is navigable in fact, the rule prima facie is that the deed conveys as far as the grantor owns.") (Quoting *4th American and English Encyclopedia of Law* 823).

This Court recognizes that the theory underlying the rule of the common law concerning grants bounded by nonnavigable rivers is, in some respects, distinguishable from the practical aspects of navigable rivers.[12] Other courts, however, have not used this distinction to reach different results for navigable rivers. Several Georgia cases indicate how the Georgia courts would rule.

In *Young v. Harrison*,[13] the Georgia Supreme Court was asked to consider riparian rights in the Chattahoochee River near Eufaula. The court noted that the bed of the Chattahoochee at Eufaula is private property subject to the servitude of the public interest by a passage upon it.[14] The court stated that, by construction of law, when the proprietor of land owns the margin, that he also owns the bed over which the river passes, even though, by terms, it is bounded on the margin.[15] Six years later, the Georgia Supreme Court clarified this opinion.[16] The court said that its ruling in *Young* held that grants of land bounded by the Chattahoochee convey title to the opposite bank of the river.[17] The grant, thus, conveyed title to the entire riverbed.

In *Jones v. The Water Lot Co. of Columbus*,[18] the Georgia Supreme Court held that a state grant bounded by the Chattahoochee River, by construction of law, reaches to the opposite shores, unless there are expressions in the terms of the grant, taken in connection with the situation and condition of the land granted, which clearly indicate the intentions of the state to stop at the margin of the river.[19]

In *Moses v. The Eagle and Phoenix Manufacturing Co.*,[20] the question before the Georgia Supreme Court was whether, by the terms in a deed, a grantor had conveyed all his interest in the bed of the Chattahoochee River in Columbus. The grantor owned the riverbed to the western shore of the Chattahoochee. The deed, however, stated that the western boundary of the property conveyed was a point twenty-five feet west of the eastern bank in the

12. *See United States v. Champlin Refining Co.*, 156 F.2d 769 (10th Cir.1946), *aff'd* 331 U.S. 788, 67 S.Ct. 1346, 91 L.Ed. 1818 (1947).

Under the rules of the common law, unless a contrary intention appears or is clearly inferable from the terms of the grant, the grantee of land, bounded by a nonnavigable stream or river, acquires title to the land to the center or thread of the water, on the theory that the grantor will not be presumed to have reserved a strip of land covered by water which will be of no practical value to him.

*Id.* at 774 (citing *Oklahoma v. Texas*, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922); *United States v. Elliott*, 131 F.2d 720, 723 (10th Cir. 1942)). The grantor of land adjoining a navigable river, however, would still, as a member of the public, have a right of passage over the entire river. He would, thus, still have access to the riverbed. *See generally Parker v. Durham*, 258 Ga. 140, 365 S.E.2d 411, 413 (1988) (The public has a right of passage on a navigable river).

13. 6 Ga. 130 (1849).

14. This characterization is consistent with a 1988 holding by the Georgia Supreme Court concerning navigable rivers. *See Parker v. Durham*, 258 Ga. 140, 365 S.E.2d 411, 413 (1988).

15. 6 Ga. at 141.

16. *See Jones v. The Water Lot Co. of Columbus*, 18 Ga. 539 (1855).

17. *Id.* at 541.

18. 18 Ga. 539 (1855).

19. *Id.* at 541.

20. 62 Ga. 455 (1879).

bed of the river.[21] The court found that because the boundary was fixed in the deed at a definite point, the deed did not convey grantor's interest in the riverbed between the fixed point and the west bank.[22] This is consistent with rulings from other jurisdictions holding that the grantor can expressly reserve part of the riverbed for himself.

In *Florida Gravel Co. v. Capital City Sand and Gravel Co.*,[23] the Georgia Supreme Court was again concerned with ownership of the bed of the Chattahoochee River. In *Florida Gravel Co.*, the court stated:

> In a large number of States the courts, following the letter of the English doctrine, hold, without qualification, that a grant or conveyance of land bounded by a navigable non-tidal river, in the absence of anything in the grant or deed to show a contrary intention, is presumed to carry title to the thread of the stream. This ruling is based on the theory that it could not be anticipated that a grantor would desire to retain title to the bed of a stream between the shore and the center line thereof, when he had conveyed the abutting upper lands.

170 Ga. at 858, 154 S.E. at 257. The court noted, however, that in many jurisdictions title to the bed of a navigable river remains with the state. The court stated that it saw no reason to change or modify its previous rulings concerning private ownership of a riverbed under navigable rivers. This decision reaffirms that a grant bounded by a navigable river conveys title to the riverbed.

Defendant conveyed a tract of land bounded by the Chattahoochee River on three sides. The deed does not express an intent to reserve the riverbed from the operation of the deed. This Court finds that, by construction of law, the Camp Deed conveyed Defendant's title to the riverbed to Kal–O–Mine. Thus, Kal–O–Mine deeded the riverbed to Lumpkin Sand when

it executed a deed to Lumpkin Sand on December 29, 1986.

**(b) Intent to Convey the Riverbed**

The Court will now address a second theory urged by Kal–O–Mine and Lumpkin Sand. Kal–O–Mine argues that the parties intended that Defendant convey the riverbed. Craig Gunter, former president of Kal–O–Mine, testified that he was personally involved in the negotiations involving Kal–O–Mine acquiring the Lumpkin property. Mr. Gunter testified he understood that everything which Defendant owned, including the riverbed, was to be conveyed to Kal–O–Mine. He testified that the riverbed had a value similar to or greater than the adjacent land. Mr. Gunter, however, acknowledged that the riverbed was shown as a separate tract (Tract six) in the Cooper deed.

Defendant argues that he did not intend to convey the riverbed to Kal–O–Mine. Defendant argues that the fact that the Camp Deed conveyed only five of the six tracts which Defendant received under the Cooper Deed clearly indicates an intent by him to keep the riverbed for himself. Defendant testified that he discussed the riverbed with Mr. Ed Kalinoski, deceased, then chairman of Kal–O–Mine, and that Kal–O–Mine knew he was keeping the riverbed.

■ The Agreement executed by Defendant and Kal–O–Mine eighteen days prior to the execution of the Camp Deed clearly shows that the riverbed (Tract six), was to be conveyed to Kal–O–Mine. Defendant and Kal–O–Mine both, however, argue that prior agreements merged with the Camp deed, and thus, the terms of the deed became controlling.

The Georgia Court of Appeals in *San Joi, Inc. v. Peek*[24] stated the merger rule as follows:

> The general rule regarding the merger of the contract for the sale of realty into

---

**21.** *Id.* at 459–60. The property conveyed extended into the riverbed but did not convey all of the riverbed which grantor owned.

**22.** *Id.* at 461.

**23.** 170 Ga. 855, 154 S.E. 255 (1930).

**24.** 140 Ga.App. 397, 231 S.E.2d 145 (1976).

the executed deed has long been settled law. "Where in a contract for the sale of land the parties executed a preliminary sales contract and subsequently reduced the contract to a finality evidenced by deed, the terms of the preliminary contract were merged into the deed, and terms or conditions or recitals contained in the preliminary sales contract which are not included in the deed will be considered as eliminated, abandoned, or discarded." (citations omitted).

140 Ga.App. at 398, 231 S.E.2d at 146.

Most Georgia cases apply the strict rule of merger. In *Fields v. Davies*,[25] the Georgia Supreme Court noted that in the absence of actual fraud, a deed is considered to be a complete relinquishment of all conflicting claims in the contract for sale.[26] Nor will equity reform a deed to conform with the provisions in the contract where there is no misplaced confidence, misrepresentation, or other fraudulent act.[27] The Court concludes that the Agreement merged with the Camp Deed and will not consider the provisions of the Agreement in determining the intent of the parties.

Lumpkin Sand and Defendant disagree concerning the intent of the parties regarding conveyance of the riverbed. Deeds are to be construed in accordance with the intentions of the parties and effect must be given to every part of the description where practicable. *Conyers v. Fulton County*, 117 Ga.App. 649, 161 S.E.2d 347, 349 (1968), *cert. denied. See also Leavell v. State Highway Department*, 121 Ga. App. 112, 173 S.E.2d 124, 126 (1970) (The cardinal rule for the construction of a deed is to ascertain the intention of the parties.). Deeds must be construed most favorably to the grantee. *Harmon v. First National Bank of Columbus*, 50 Ga.App. 3, 6, 176 S.E. 833 (1934).

**25.** 235 Ga. 87, 218 S.E.2d 828 (1975).

**26.** *Id.*, 218 S.E.2d at 830.

**27.** *See* O.C.G.A. § 23-2-29 (1982), which states: "If a party, by reasonable diligence, could have had knowledge of the truth, equity shall not grant relief; nor shall the ignorance of a fact

The facts show that Defendant conveyed certain property to Kal-O-Mine by deed dated January 23, 1986 (the Camp Deed). After observing the demeanor of the witnesses and the evidence presented, the Court believes that the parties intended that Defendant convey both the land and the riverbed to Kal-O-Mine. The Court believes that Kal-O-Mine was to acquire a workable sand and gravel operation. The riverbed was part of the operation. Defendant has not presented any documents which expressly show a mutually agreed upon intent not to convey the riverbed.

## II. *Personal Property Located on the Lumpkin Property*

Located upon the Lumpkin property are a dredge (discussed separately), several trucks, various pieces of equipment and several pieces of iron (hereinafter collectively referred to as "personalty"). Lumpkin Sand claims ownership, stating that the dredge was a fixture and thus passed with the realty. Lumpkin Sand also argues that the parties intended that the dredge and personalty would be conveyed. Defendant denies these allegations and claims ownership of the dredge and personalty.

Under Georgia law a deed conveying land conveys all structures permanently affixed to the land which constitute a part of the realty. *Trust Company Bank of Middle Georgia, N.A. v. Huckabee Auto Co. (In re Huckabee Auto Co.)*, 58 B.R. 826, 829–30 (Bankr.M.D.Ga.1986) (citations omitted). Section 44-1-6 of the Official Code of Georgia[28] describes a fixture as follows:

(a) Anything which is intended to remain permanently in its place even if it is not actually attached to the land is a fixture which constitutes a part of the realty and passes with it.

(b) Machinery which is not actually attached to the realty but is movable at pleasure is not a part of the realty.

known to the opposite party justify an interference if there has been no misplaced confidence, misrepresentation, or other fraudulent act." *Id. See also Martin v. Heard*, 239 Ga. 816, 238 S.E.2d 899, 900 (1977).

**28.** O.C.G.A. § 44-1-6 (1982).

(c) Anything detached from the realty becomes personalty instantly upon being detached.

O.C.G.A. § 44–1–6 (1982). All fixtures whether actually or constructionally annexed to the realty pass by a conveyance of the freehold, absence an agreement to the contrary. *See Brigham v. Overstreet,* 128 Ga. 447, 57 S.E. 484 (1907); *Wolff v. Sampson,* 123 Ga. 400, 51 S.E. 335 (1905).

The United States Court of Appeals for the Eleventh Circuit recently discussed the factors Georgia courts use in determining whether an article is real or personal property. In *Walker v. Washington (In re Washington),*[29] the court stated:

> Georgia courts have used three factors in analyzing whether an object is personalty or realty. *Homac, Inc. v. Fort Wayne Mortgage Co.,* 577 F.Supp. 1065, 1069 (N.D.Ga.1983). First, the Court looks to the degree to which the object has become integrated with or attached to the land. Under Georgia law, if an article cannot be removed from the land without suffering "essential injury," it is considered a fixture. *Id., citing Wade v. Johnston,* 25 Ga. 331, 336 (1858).
>
> Second, a court must consider the intention of the parties with regard to the status of the object. *In re Janmar, Inc.,* 4 B.R. 4, 9 (N.D.Ga.1979). An item will remain personalty if the parties so contract, even if the item is permanently affixed to realty.
>
> Third, the Court determines whether there is unity of title between the personalty and the realty at the time the object allegedly became part of the land:
>
> > When the ownership of the land is in one person and the thing affixed to it is in another, and in its nature it is capable of severance without injury to the former, the fixture can not, in contemplation of law, become a part of the land, but must necessarily remain distinct property to be used and dealt with as personal estate.

*Homac,* 577 F.Supp. at 1070, *citing Holland Furnace Co. v. Lowe,* 172 Ga. 815, 159 S.E. 277 (1931).

837 F.2d at 456–57.

In *Goger v. United States (In re Janmar, Inc.),*[30] the court stated:

> "Whether an article of personalty connected with or attached to realty becomes a part of the realty, and therefore such a fixture that it cannot be removed therefrom, depends upon the circumstances under which the article was placed upon the realty, the uses to which it is adapted, and the parties who are at issue as to whether such an article is realty or detachable personalty." *Wolff v. Sampson,* 123 Ga. 400, 402, 51 S.E. 335–336 (1905); *Consolidated Warehouse Co. v. Smith,* 55 Ga.App. 216, 189 S.E. 724 (1937). It is also the law in Georgia that this determination is a question of fact. *Babson Credit Plan v. Cordele Production Credit Ass'n,* 146 Ga.App. 266, 246 S.E.2d 354 (1978).

4 B.R. 4, 9 (Bankr.N.D.Ga.1979).

**(a) The Dredge**

 The facts show that the dredge is a large piece of equipment which floats on pontoons in an enclosed artificial pond. Lumpkin Sand estimates the dredge to be thirty feet long by fifteen feet wide. Defendant states that it probably weights thirty to forty-five tons. A series of twelve-inch pipes attached to the dredge span across the lake and are embedded in a concrete structure on the shore. To remove the dredge from the pond, it would have to be lifted by a crane to the shore, cut into three pieces by an acetylene torch, and put on trucks. This process would take about two months. The dredge is used to pump sand and gravel up from the pond floor so that it can be processed for sale. The dredge is a primary piece of equipment in the mining operation.

Defendant testified that he designed and had the dredge built. He also testified that he had moved the dredge—by using a bull-

---

**29.** 837 F.2d 455 (11th Cir.1988).

**30.** 4 B.R. 4 (Bankr.N.D.Ga.1979).

dozer. Defendant says that he did not intend to abandon the dredge.

In *Colorado Gold Dredging Co. v. Stearns–Roger Manufacturing Co.,*[31] the court held that a dredge similar to the one in this case was part of the realty. The dredge floated in an artificial pond and removed sand, gravel, and rocks from the pond. The court noted that a fixture does not have to be affixed to the land. The court stated that the dredge was intended for permanently working the deposit and that had the dredge itself been actually affixed to the land, that the use for which it was intended would not have been possible.

This Court concludes that the dredge is a fixture and that ownership passed to Kal–O–Mine under the Camp Deed. Kal–O–Mine then conveyed the dredge to Lumpkin Sand when it executed a deed to Lumpkin Sand on December 29, 1986.

### (b) Equipment, Scrap Iron, and Trucks (Personalty)

Several old trucks and various pieces of equipment and scrap iron used in the mining of sand and gravel remain on the Lumpkin property. Six to eight-inch diameter trees are growing through some of this equipment. Some of the equipment needs repair or is no longer repairable. Many pieces appear to have been on the property for a long time. Defendant did not remove the personalty before he executed the Camp Deed. The personalty is not included in either the contract for sale, the deed, or any other written document. Mr. Steve Miller, current president of Kal–O–Mine, admitted at trial that the personalty is not a fixture. Lumpkin Sand admits that it has no bill of sale, deed or other documents showing that the personalty was conveyed to it.

■ Defendant argues in his post-trial brief that section 11–2–201(1) of the Offi-

cial Code of Georgia[32] requires the sale of the personalty in question to be in writing. That section provides:

(1) Except as otherwise provided in this Code section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

O.C.G.A. § 11–2–201(1) (1982). There are no written documents which show the personalty on the Lumpkin property has been conveyed to Kal–O–Mine or Lumpkin Sand. The facts indicate that the value of the personalty exceeds $500.

■ Defendant filed his answer on May 26, 1989. He failed to assert the statute of frauds as a defense. The statute of frauds[33] is an affirmative defense under both the Federal Rules of Civil Procedure[34] and the Georgia Civil Practice Act.[35] The failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case. *See Troxler v. Owens–Illinois, Inc.,* 717 F.2d 530, 532 (11th Cir.1983). An unalleged affirmative defense cannot be proven under a general denial. 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1278 (1969 & Supp.1989). Nor did Defendant raise the statute of frauds defense at trial. Defendant did question Kal–O–Mine's agent concerning whether Kal–O–Mine had any written documents showing a sale of the personalty. The Court, however, does not believe Defendant's statements and questions at trial to be an express or im-

---

**31.** 60 Colo. 412, 153 P. 765 (1916).

**32.** O.C.G.A. § 11–2–201(1) (1982).

**33.** The title of O.C.G.A. § 11–2–201 (1982) is "Formal Requirements; statute of frauds."

**34.** *See* Fed.R.Civ.P. 8(c). The provisions of Federal Rules of Civil Procedure 8 applies in adversary proceedings in bankruptcy courts. *See* R. Bankr.P. 7008(a).

**35.** *See* O.C.G.A. § 9–11–8(c) (1982).

plied consent by the parties such that Defendant's answers were amended to include the statute of frauds as a defense.[36] The admission by Kal–O–Mine that it had no written documents hardly constitutes consent for Defendant to raise an affirmative defense in a post-trial brief. The purpose of the requirement that affirmative defenses be pleaded is to prevent surprise and to give the opposing party fair notice of what he must meet as a defense. *See Phillips v. State Farm Mutual Auto Ins. Co.*, 121 Ga.App. 342, 346, 173 S.E.2d 723, 726 (1970); *See also United McGill Corp. v. Gerngross Corp.*, 689 F.2d 52, 54 (3rd Cir. 1982); *Hall v. First National Bank*, 145 Ga.App. 267, 269, 243 S.E.2d 569, 571 (1978). To allow Defendant to raise the statute of frauds defense for the first time in his post-trial brief would be contrary to the purpose of the pleading requirements. This Court therefore holds that Defendant failed to properly plead the statute of frauds and waived it as a defense.

■ Even if Defendant had properly pled the statute of frauds, the facts show that the contract is enforceable notwithstanding the absence of any written documents. A buyer's receipt and acceptance of goods removes an oral agreement between the parties from the writing requirements of the statute of frauds due to part performance of the contract. Section 11–2–201(3)(c) of the Official Code of Georgia [37] provides: "(3) A contract which does not satisfy the requirements of subsection (1) of this Code section but which is valid in other respects is enforceable: ... (c) With respect to goods for which payment has been made and accepted or which have been received and accepted." O.C.G.A. § 11–2–201(3)(c) (1982). Receipt of goods means taking physical possession of them.

O.C.G.A. § 11–2–103(1)(c) (1982). Acceptance of goods is effected as follows:

(1) Acceptance of goods occurs when the buyer:

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) Fails to make an effective rejection (subsection (1) of Code Section 11–2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

O.C.G.A. § 11–2–606(1) (1982). By express terms of the U.C.C. statute of frauds, a contract need not be in writing to be enforceable with respect to goods "which have been received and accepted." *Seminole Peanut Co. v. Goodson*, 176 Ga.App. 42, 335 S.E.2d 157, 159 (1985). *See also Bicknell v. Joyce Sportswear Co.*, 173 Ga.App. 897, 328 S.E.2d 564, 565 (1985); *Jem Patents, Inc. v. Frost*, 156 Ga.App. 311, 274 S.E.2d 707 (1980).

It is uncontroverted that Lumpkin Sand has physical possession of the personalty and has had possession since being conveyed the Lumpkin property by Kal–O–Mine. The personalty is on the Lumpkin property which is owned by Lumpkin Sand. Thus, Lumpkin Sand has received the personalty. Under section 11–2–606(1)(b), Kal–O–Mine and Lumpkin Sand have accepted the personalty because, having had a reasonable opportunity to inspect the personalty, they have not rejected it. The Court finds that the statute of frauds does not apply to this contract because the personalty has been received and accepted.

---

**36.** Fed.R.Civ.P. 15(b) provides, in part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." *Id. Contra American Nat. Bank of Jacksonville v. Federal Dep. Ins. Corp.*, 710 F.2d 1528, 1537–39 (11th Cir.1983) (Mere advancement of a notion that affirmative defense existed does not imply an implied consent to litigate); *Glass Containers*

*Corp. v. Miller Brewing Co.*, 643 F.2d 308, 312 (5th Cir. Unit A April 22, 1981) (In reviewing an assertion that an issue has been tried by implied consent, the record must be carefully examined. The court has no obligation to introduce issues inferentially suggested by incidental evidence in the record.)

**37.** O.C.G.A. § 11–2–201(3)(c) (1982).

■ "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13–3–1 (1982). Both Kal–O–Mine and Defendant had legal capacity to enter into a valid contract. The Court must consider whether there was an assent to the terms of the contract and a consideration. The first question concerns whether there was a meeting of the minds concerning what Kal–O–Mine was buying and what Defendant was selling. *See generally Associated Mutuals, Inc. v. Pope Lumber Co.*, 200 Ga. 487, 37 S.E.2d 393, 398 (1946) (Parties must assent to all terms in same sense); *Taylor Lumber Co. v. Clark Lumber Co.*, 33 Ga.App. 815, 127 S.E. 905 (1925) (Meeting of minds of parties is necessary).

Kal–O–Mine and Lumpkin Sand argue that Kal–O–Mine bought everything which Defendant owned. This included the land, riverbed, minerals, dredge, equipment and trucks. Their witnesses testified that when they inspected the property with Defendant after execution of the Camp Deed, that their understanding was that Kal–O–Mine owned everything on it. Defendant never expressed any intent to remove any personalty. When Defendant went to various banks to help Kal–O–Mine obtain financing, he never told the banks that the personalty belonged to him and not Lumpkin Sand.

Defendant states that he and Ed Kalinoski, deceased former chairman of Kal–O–Mine, agreed that Kal–O–Mine would buy the land but that Defendant would keep the personalty. Defendant testified that he did not remove the personalty for two reasons. First, he was attempting to enter into an employment contract with Kal–O–Mine and it would be inconsistent for him to remove the personalty while seeking employment. Second, Defendant's son, Wilson M. Camp, III, and Mr. Pat Kalinoski[38] leased the Lumpkin property from Kal–O–Mine in May 1986. They planned to operate a sand and gravel operation and would need the personalty to do so. Finally, Defendant argues that the personalty on the Lumpkin property belongs to Camp Concrete Industries, Inc. The Court is not persuaded by Defendant's argument on this issue because it is not supported by other evidence.

Having observed the demeanor of the witnesses and the evidence presented, the Court believes that the parties intended that Defendant convey to Kal–O–Mine a workable sand and gravel operation. Kal–O–Mine had very limited experience in the sand and gravel business. It is reasonable that it would need, and expected the conveyance to include, the land, the riverbed, minerals, the equipment, dredge, and trucks. Defendant received three million shares of stock in Kal–O–Mine in consideration for the transfer. Because the Court is persuaded that the parties intended that Kal–O–Mine acquire a workable sand and gravel operation, it is persuaded that ownership of the personalty passed to Kal–O–Mine and then to Lumpkin Sand. The Court holds that Lumpkin Sand owns the personalty (equipment, trucks, scrap iron) and other personal property located on the Lumpkin property.

### III. *Ownership of the Camp Lightweight, Inc. Property*

■ The Court now turns to the Camp Lightweight case. Kal–O–Mine contends that it is the owner of the property formerly owned by Camp Lightweight pursuant to the confirmed Chapter 11 plan of Camp Lightweight. Defendant claims that he is still the owner because the distribution date of the confirmed plan has not been reached.

Camp Lightweight filed an Amended Plan of Reorganization on June 23, 1986. A modification of the Amended Plan of Reorganization was filed on August 19, 1986. The Court entered an order confirming the amended plan as modified on August 19, 1986. All parties to this matter are bound by the provisions of the con-

---

**38.** Pat Kalinoski is the son of Ed Kalinoski, deceased former chairman of the board of Kal–O–Mine.

firmed plan. Section 1141(a) of the Bankruptcy Code [39] provides:

> (a) Except as provided in subsection (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in, the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C.A. § 1141(a) (West Supp.1989). *See In re Auto Dealers Services, Inc.,* 89 B.R. 233, 235 (Bankr.M.D.Fla.1988); *In re White Farm Equipment Co.,* 38 B.R. 718, 724 (Bankr.N.D.Ohio 1984).

The confirmed plan provides that title to the Camp Lightweight assets will be transferred to Kal–O–Mine on the distribution date. Section 5.02 of the confirmed plan provides as follows:

> 5.02 Title Transfer: Title to the assets of the debtor shall be assigned and transferred to the successor on the distribution date. A condition to this plan is the assignment to Kal–O–Mine of title and rights in all property, equipment or equipment leases held by the debtor, and any related property and equipment held by certain third parties or entities.

Section 1.10 of the confirmed plan defines Distribution Date as follows:

> 1.10 DISTRIBUTION DATE shall mean the date upon which the Order of Confirmation is no longer subject to appeal or certiorari proceeding, on which date no such appeal or certiorari proceeding is then pending and on which date all of the conditions to the effectiveness of the Plan expressly set forth in the Plan have been satisfied fully, or effectively waived.

In summary, title to Camp Lightweight's assets will be transferred to Kal–O–Mine when all the conditions to the effectiveness of the plan had been satisfied fully.[40]

The plan was to be financed as follows:

> 5.01 Reorganization: To finance this plan, the debtor has entered and proposes as part of the plan to enter the following contracts, subject to approval as part of this plan:

> Kal–O–Mine Industries, Inc., a publicly traded Colorado corporation executed an agreement on January 5, 1986 to acquire 100% ownership and control of Camp Lightweight, Inc., debtor in possession for purposes of reorganizing the company and will retain 100% ownership following reorganization. Kal–O–Mine has completed a registration statement for $2.5 million preferred stock offering, Series B, the proceeds from which are committed to investment into and reorganization of the debtor pursuant to this plan. The plan and the $2.5 million in funding are committed to commencing and achieving profitable operation of the Camp Lightweight aggregate facility and to realize substantially greater operating concern values, returns and liquidation preferences for the creditors than they would receive in liquidation.

The confirmed plan provides:

> 5.04 *Use of Borrowed Funds:* All funds derived by reason of the pledge, encumbrance, or hypothecation of the present assets of the debter [sic] in possession shall be used for operating capital or other purposes directly benefiting the business operations or the estate of the debtor in possession or the successor to the debtor in possession for the benefit of the lightweight aggregate plant in Clay County, Georgia. This provision will be effective for the six years next following the entry of the order of confirmation.

Kal–O–Mine argues that consummation of the plan has been delayed because of Defendant's continued claims of ownership and other efforts to frustrate consummation of the confirmed plan. Kal–O–Mine's witnesses testified that they have attempt-

---

**39.** 11 U.S.C.A. § 1141(a) (West Supp.1989).

**40.** The date upon which the order of confirmation could be appealed has long since expired.

ed to obtain financing for the plan since the plan was confirmed in August 1986 but their efforts have been stalled by title problems. Kal–O–Mine demonstrated that at least fifteen entities have checked the title to the property in question. Kal–O–Mine has demonstrated that no one is willing to loan money until the title issue is resolved.

The amended plan created eight classes of claims. Kal–O–Mine submits that it has complied with the plan concerning treatment of claims in Classes Three, Four, Five, Seven, and Eight. The Class Five claimant repossessed certain equipment, thus satisfying its claim. Classes Three, Four, and Seven claimants were issued preferred stock, which has been converted to common stock. In addition, the unsecured portion of Class Two was issued preferred stock which was later converted to common stock. Class Eight was to receive nothing under the plan.[41]

Kal–O–Mine submits that the following payments remain to be made under the plan:

| Class | Approximate Amount |
|---|---|
| One | $ 30,000 |
| Two (Secured Portion) | 459,000 [42] |
| Six | 30,000 |
| Total | $519,000 |

Kal–O–Mine asserts that after these payments are made, absolutely nothing would remain to be paid under the plan.

Mr. Gary J. Graham, president of Graham and Associates, a private investment banking firm, testified that he was contacted about one year ago by Kal–O–Mine to help obtain financing. Mr. Graham testified that he has extensive experience in obtaining financing, especially in the mining industry. Mr. Graham testified that he has been unable to provide funding primarily because of title problems concerning the Lumpkin and Camp Lightweight proper-

ties. He testified, however, that he can provide $2.5 million in financing if the title problems can be resolved. Mr. Graham testified that $1.1 million of this amount will be a personal contribution. Finally, he testified that he believes the proposed operations, properly structured and collateralized, would be sufficient to service the loan he proposes to make.

Mr. Kenneth Tribby, director of Kal–O–Mine, testified that Kal–O–Mine has a commitment for an approximately $2 million loan from a bank. Part of this loan would be used to pay off liens to Trust Company Bank, the Bank of Eufaula, and Mr. Leon Camp. Part of the loan would also be used to finance start up of both the Lumpkin and Camp Lightweight operations. Mr. Tribby testified that if the Lumpkin and Camp Lightweight properties are not operated and, instead end up in Chapter 7 liquidation, that very few of the creditors in these two Chapter 11 cases would receive anything. The Court is persuaded this is a correct conclusion.

Defendant contends that title to the Camp Lightweight property never passed to Kal–O–Mine because the distribution date has not arrived. Defendant argues that Kal–O–Mine has paid out very little of the cash required under the plan and that all Kal–O–Mine has done is issue stock, which cost Kal–O–Mine nothing. Defendant further argues that under the confirmed plan, financing was to come from the sale of preferred stock rather than from the borrowing of money.

■ Following confirmation, compliance with the plan becomes the business agenda of the postconfirmation entity which is required to make payments as provided for in the plan. *In re Jartran, Inc.*, 76 B.R. 123, 125 (Bankr.N.D.Ill.1987). Since confirmation, Kal–O–Mine has sought

---

**41.** Kal–O–Mine has demonstrated that Defendant, a Class Eight claimant, was issued 1,000,000 shares of stock in error.

**42.** Kal–O–Mine has demonstrated that $459,000 is owed to the Trust Company Bank as trustee

for the bond holders. Kal–O–Mine has also shown that this is the same obligation reflected in the Lumpkin Sand and Gravel case and that payment would satisfy Trust Company Bank in each case.

financing for the plan. It has been unable to obtain financing because of title questions to the Lumpkin and Camp Lightweight properties. Kal–O–Mine has a loan commitment from a bank for $2 million. An investment banker has demonstrated that he can provide $2.5 million, including $1.1 million of his personal assets, when the title issues are resolved. This Court believes that section 5.04 of the confirmed plan contemplates that Debtor would seek and use borrowed funds. The Court notes the circuity of the position being asserted. Mr. Graham has money for the financing but cannot provide it until the title issues are resolved. Kal–O–Mine wants to comply with the plan by paying the remaining creditors, but cannot until Mr. Graham provides the money. Defendant says he still owns title to the properties because Kal–O–Mine has not complied with the plan and, thus, the distribution date has not been reached. It is, however, Defendant's conduct that has prevented the financing from being completed.

Section 5.01 of the confirmed plan states that on January 5, 1986, Kal–O–Mine agreed to acquire one hundred percent ownership and control of Camp Lightweight for the purpose of reorganizing it. The section continues stating that Kal–O–Mine will *retain* one hundred percent ownership of Debtor following reorganization. Retain means: "To continue to hold, have, use, reorganize, etc., and to keep." *Black's Law Dictionary* 1183 (5th ed. 1979). This language shows that the plan contemplated that ownership and control of Camp Lightweight would pass to Kal–O–Mine. Kal–O–Mine, under the terms of the confirmed plan, is to *retain* that ownership.

Kal–O–Mine has possession of Defendant's stock certificate for Camp Lightweight.[43] The Court does not believe that Defendant would have surrendered his stock certificate to Kal–O–Mine unless he knew that Kal–O–Mine was in fact the owner of Camp Lightweight.

Kal–O–Mine has arranged financing sufficient to pay the remaining three classes of claims. Upon payment of Classes One, Two, and Six, which are to be paid from the financing, the confirmed plan will be fully consummated. Defendant's claims to title have prevented Kal–O–Mine from obtaining financing. The evidence shows that creditors will receive more under the plan than they would receive in liquidation. This Court will not allow Defendant to hinder Kal–O–Mine's acquisition of needed funding by asserting claims of title, and at the same time, complain that Kal–O–Mine has not complied with the plan. The Court concludes that Kal–O–Mine owns title to the Camp Lightweight property as a result of Camp Lightweight's Chapter 11 reorganization.

██ Defendant also claims that Kal–O–Mine is obligated to enter into an employment agreement with him under the confirmed plan. Section 5.03 of the confirmed plan states:

5.03 Management Contract: Kal–O–Mine Industries, Inc. has contracted with Mr. Wilson Camp (the founder, past owner and president of the debtor) to continue his employment to manage the day-to-day operations (but not the financial responsibility) of the debtor's facility upon reorganization under the ownership, direction and complete supervision of Kal–O–Mine.

The plan specifically states that Defendant will not have financial responsibility for Camp Lightweight's operations. The plan was signed by Defendant, as president of Camp Lightweight. The evidence shows that Kal–O–Mine sent one or more draft employment agreements to Defendant. Defendant changed several provisions in the draft agreements. Defendant wanted to be president rather than manager of Camp Lightweight and wanted to retain financial responsibility of Camp Lightweight. Kal–O–Mine declined to accept these changes. The Court notes that Defendant also struck the requirement in the draft agreements that he remain loyal to Kal–O–Mine. The Court is persuaded that Kal–O–Mine has met its obligation under

---

**43.** The Court notes that Defendant has not signed the back of the stock certificate.

the plan to make a good faith offer of employment to Defendant.

An order in accordance with this opinion is attached hereto.

## ORDER

Based upon the attached and foregoing findings of fact and conclusions of law; it is

ORDERED that Kal–O–Mine Industries, Inc. hereby is determined to be the owner of all real and personal property and equipment leases owned by Camp Lightweight, Inc.; and it is further

ORDERED that Lumpkin Sand and Gravel, Inc. hereby is determined to be the owner of the riverbed adjoining that 579.-66–acre tract of land in Muscogee County, Georgia, which was conveyed to Kal–O–Mine Resources, Inc. by Wilson M. Camp, II, (the "Lumpkin property") to the extent the riverbed may be privately owned; and it is further

ORDERED that Lumpkin Sand and Gravel, Inc. hereby is determined to be the owner of all fixtures and personal property located on the Lumpkin property; and it is further

ORDERED that this order be entered on the dockets on the date set out below.

SO ORDERED.